# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SURF'S UP LEGACY PARTNERS, LLC (f/k/a KAABOO, LLC), *et. al.*, | ) ) ) ) | |
| Plaintiffs-Counterclaim Defendants, | ) ) ) | |
| v. | ) ) ) | C.A. No. N19C-11-092 PRW CCLD |
| VIRGIN FEST, LLC, *et. al.*, | ) ) ) | |
| Defendants-Counterclaim Plaintiffs. | ) ) ) | |

Submitted: February 29, 2024
Decided: April 12, 2024

## <u>DECISION AFTER TRIAL</u>

Theodore A. Kittila, Esquire, and James G. MacMillan, III, Esquire, Halloran Farkas + Kittila LLP, Wilmington, Delaware, Jeffrey M. Greilsheimer, Esquire, Halloran Farkas + Kittila LLP, New York, New York. *Attorneys for Plaintiffs-Counterclaim Defendants Surf's Up Legacy Partners, LLC, et al., Counterclaim Plaintiff-Counterclaim Defendant Bryan Gordon, and Counterclaim Defendants Robert Walker and Seth Wolkov.*

Robert K. Beste, Esquire, Smith, Katzenstein & Jenkins LLP, Wilmington, Delaware, John Black, Esquire, Lash & Goldberg LLP, Miami, Florida, Sam Buffone, Esquire, Buffone Law Group, Washington, District of Columbia. *Attorneys for Defendants-Counterclaim Plaintiffs Virgin Fest, LLC, et al.*

**WALLACE, J.**

# I.  INTRODUCTION

KAABOO was entering its fifth year of producing live music and outdoor entertainment festivals.  But for the party to go on, it needed capital.  As of that fifth year, and contrary to KAABOO's hopeful expectations, its festivals hadn't turned a profit.  Now tapped dry, KAABOO's last resort was the sale of its flagship festival, KAABOO Del Mar.  Shifting away from a model of both owning and operating music festivals, KAABOO aimed to just operate them by entering into long-term managements contracts with a prospective buyer.  Soon, an interested party emerged—Virgin Fest—a music-brand company that leveraged a trademark licensing agreement it held with an investment company founded by British business magnate Sir Richard Branson.

At first glance, a partnership between Virgin Fest and KAABOO seemed it might capitalize on the strengths of both companies:  Virgin Fest would focus on brand development and marketing; KAABOO could produce and operate festivals.  But to make itself an attractive target for a sale, KAABOO fudged its numbers and presented an inaccurate picture of its profitability.

As Virgin Fest and KAABOO moved closer to a deal, KAABOO's cash needs grew more dire as critical deadlines approached for putting on the upcoming KAABOO festival in Del Mar, California.  At the eleventh hour, Virgin Fest fronted the cash KAABOO needed to avert canceling the event.  And, on the eve of the Del

Mar event, Virgin Fest entered into the asset purchase agreement to acquire KAABOO and most of its assets. In exchange, KAABOO received $10 million in cash consideration—$2 million of which had already been advanced for Del Mar festival costs—and ten-year management contracts to produce future festivals on Virgin Fest's behalf.

After several months of negotiations, the Del Mar festival finally took place. It was a three-day event and, from outward appearances, a hit. For the moment, it seemed, that festival seemed a prelude of better things to come.

But the music stopped and the lights dimmed on any prospect for a long-term business relationship between KAABOO and Virgin Fest. Failing to make any profit from the festival, KAABOO slashed its workforce, firing many senior members and promoting others with limited experience to fill the vacant roles. Upon hearing of rumored terminations, Virgin Fest communicated its concerns that KAABOO's anticipated staffing decisions jeopardized KAABOO's ability to produce high-quality events. When KAABOO didn't allay those concerns, Virgin Fest sent a letter to KAABOO relating to its right to terminate the long-term management contracts it had entered into. KAABOO did not cure the defaults identified in the letter, and countered that Virgin Fest, its only client, materially breached its obligations by failing to pay for KAABOO's services.

All played out, KAABOO shut down the business and sued Virgin Fest.

Virgin Fest counterclaimed alleging fraud and breach of contract, arising from the asset purchase agreement and the management contracts.

The record shows that while KAABOO's management misrepresented the financial health of the Company, Virgin Fest failed to prove justifiable reliance on those misrepresentations. Thus, Virgin Fest's fraud claims fail—but, its related contractual claims under the APA do not, and damages therefrom are subject to the APA's indemnification cap.

Virgin Fest has also prevailed on its claims under the management contracts. Virgin Fest has proven by a preponderance of the evidence that KAABOO materially breached its obligations under those agreements by terminating several staff members and failing to take corrective action after Virgin Fest provided notice to do so. Virgin Fest, therefore, did not wrongly terminate the management contracts, and primarily on that basis, KAABOO's contractual claims fail.

With regard to Bryan Gordon's claims, he is entitled to his consulting fees in connection with his resignation from Virgin Fest.

## II. THE TRIAL

Trial took place over seven days. The record consists of 676 exhibits, 21 deposition transcripts, and live testimony from six fact witnesses and two expert

witnesses, as well as the facts stipulated to by the parties.[1]

## III. FINDINGS OF FACT

It is difficult at times in the trial of certain actions to fully and cleanly segregate findings of fact from conclusions of law. To the extent any one of the Court's findings of fact here might be more appropriately viewed as a conclusion of law, that finding of fact may be considered the Court's conclusion of law on that point.[2]

### A. KAABOO[3]

At centerstage in this nearly five-year-long litigation performance is the music and entertainment festival business known as "KAABOO."[4] In 2015, KAABOO,

---

[1]    This decision cites to: trial exhibits (by "JX" number); the trial transcript ("[Last Name] Tr."); deposition transcripts ("[Last Name] Dep. Tr."); and stipulated facts set forth in the Pre-Trial Order ("PTO") (D.I. 397). The witnesses in order of appearance were: Robert Walker, Rebecca Shepherd, Seth Wolkov, Jason Felts, Marc Hagle, Bryan Gordon, Gregory Cowhey, and Jeffrey George. This decision also cites to the uncontested facts in the Complaint ("Compl.") and Second Amended and Supplemental Answer and Counterclaims Against Plaintiffs, Bryan Gordon, Seth Wolkov, and Robert Walker ("SACC") (D.I. 227).

[2]    *See Facchina Constr. Litigs.*, 2020 WL 6363678, at *2 n.12 (Del. Super. Ct. Oct. 29, 2020) (collecting authority).

[3]    Plaintiffs are Surf's Up Legacy Partners, LLC (f/k/a KAABOO, LLC), Eventpro Management, LLC (f/k/a KAABOO Management, LLC), Eventpro Production Services, LLC (f/k/a KB Eventpro LLC), Eventpro Del Mar, LLC (f/k/a KAABOO – Del Mar LLC), Eventpro Services, LLC (f/k/a KAABOOWorks Services, LLC), Eventpro Contract Services, LLC (f/k/a KAABOO Contract Services LLC), and Eventproworks, LLC (f/k/a KAABOOWorks, LLC). Counterclaim-defendants are Bryan Gordon, Seth Wolkov and Robert Walker. Defendants are Virgin Fest, LLC, Virgin Fest Investco, LLC, VFLA Eventco LLC, and KSD Ownco, LLC (f/k/a San Diego Fest Ownco, LLC). Plaintiffs and Counterclaim-defendants will collectively be called "KAABOO," and Defendants, "Virgin Fest," unless further specificity is required.

[4]    PTO ¶ 34.

LLC ("KAABOO" or the "Company")[5] began producing an annual three-day music festival in Del Mar, California ("KAABOO Del Mar").[6] Headliners included AeroSmith, Snoop Dogg, and P!nk, and attendance ranged from 25,000 to 30,000 a day.[7]

KAABOO was known for its mix of art, comedy, and culinary experiences.[8] The festival grounds displayed billboard-size murals; uniquely, an artist painted an original mural beginning at the start of the festival and finishing by its end.[9] KAABOO believed this "elevated" music and art experience attracted older, more affluent audiences in the music festival industry.[10]

Though KAABOO Del Mar was successful from a customer-facing view,[11] it never turned a profit.[12] In its first year, KAABOO Del Mar had a negative EBITDA

---

[5]   KAABOO, LLC is now known as Surf's Up Legacy Partners, LLC.

[6]   Compl. ¶ 23; Walker Tr. at 13.

[7]   Walker Tr. at 11, 22.

[8]   *Id.* at 10.

[9]   Felts Tr. at 769-70,

[10]  Walker Tr. at 10.

[11]  Hagle Tr. at 969 ("I was extremely impressed. It was amazing and well organized. It was an artistic piece of work. The displays, the organization of displays, the physical nature of the people, it was a very sophisticated project, very well done, very well organized, very well run, very entertaining."); Gordon Tr. at 1209-10 ("From a customer-facing point of view, I would say exceedingly successful . . . From a sort of brand recognition point of view within the press, within the industry, similarly great applause for—for the event consistently"); Felts Tr. at 749 ("The event was elevated, as everybody has testified heretofore in this proceeding, and the event, [KAABOO] event, was done in a first class manner with, you know, VIP tickets and great sponsorships and a clean—a clean and aesthetically pleasing environment.").

[12]  *See* JX160 at 6029.

of $9.3 million, negative $5.8 million in 2016, negative $3.7 million in 2017, and negative $3.5 million in 2018.[13]

## B. KAABOO'S FINANCING EFFORTS ARE UNSUCCESSFUL.

Going into 2019, KAABOO had significant cash needs to continue operating. Following the 2018 KAABOO Del Mar festival, KAABOO owed approximately $1.8 million to vendors.[14] What's worse, at that point, KAABOO could no longer rely on a primary source of financial support. By then, KAABOO's founder and largest stockholder, Bryan Gordon, told KAABOO's management that he would "not be able to come to the rescue this time."[15] In short, 2019 was going to be critical to KAABOO's continued viability.

It didn't start off well. KAABOO's two inaugural festivals—KAABOO Cayman and KAABOO Dallas—failed to generate the cash flow KAABOO needed. KAABOO Cayman was held in February, and KAABOO Dallas in May.[16] Following KAABOO Cayman, KAABOO lost the support of its joint venture partner, and as a result, became obligated to pay over a million in ticket refunds for the cancellation of the event in 2020.[17] KAABOO Dallas fared even worse.

---

[13]  *Id*.

[14]  JX267 at 2; JX053 at 6161; Shepherd Tr. at 129.

[15]  JX61 at 6687; Walker Tr. at 155-56; Wolkov Tr. at 410-12; Gordon Tr. at 1308.

[16]  Walker Tr. at 12-13.

[17]  JX478 at 3027.

Attendance was 50% less, and losses $8 million more, than forecasted.[18]

Meanwhile, KAABOO unsuccessfully sought to raise $4 million of senior debt financing, contacting close to 80 parties.[19] KAABOO was only able to receive a $1 million senior bridge loan.[20] KAABOO also tried to raise $20 million via a Series B raise, but failed to generate any proposals from the over 130 investors it contacted.[21]

With no success in its financing efforts, KAABOO's cash deadlines to put on the 2019 KAABOO Del Mar festival did not slow. $1.6 million in talent deposits were due on August 14th, and the final talent deposit was due about a week before the KAABOO Del Mar festival's September 13 start date.[22] The failure of either would result in cancellation of the event.[23] By the summer of 2019, KAABOO's strategy shifted to a sale of KAABOO's assets.[24] KAABOO's search for a potential buyer soon led them to Virgin Fest, LLC.

---

[18]  *Id.* at 3025-26.

[19]  *Id*. at 3023.

[20]  *Id.*; Walker Tr. at 148.

[21]  JX478 at 3025.

[22]  JX267 at 1.

[23]  *Id.*

[24]  *Id.* at 2.

## C. VIRGIN FEST

Jason Felts formed Virgin Fest with Mr. Gordon in the summer of 2018.[25] Prior to founding Virgin Fest, Mr. Felts managed an entertainment and content production company known as "Virgin Produced."[26] Virgin Produced provided video content to KAABOO.[27] After the 2016 KAABOO Del Mar festival, Mr. Felts began working for KAABOO as its Chief Marketing and Brand Officer. He also joined its board of directors.[28]

Virgin Fest leveraged the Virgin brand in entering the music festival business through a trademark licensing agreement with Virgin Enterprise Limited ("VEL"), a company founded by multi-billionaire Sir Richard Branson.[29] As co-founders and 50/50 partners of Virgin Fest, Mr. Felts focused on providing brand management and marketing, while Mr. Gordon offered management and event production expertise gained from running KAABOO.[30] In contrast to KAABOO, Virgin Fest was aimed at younger audiences, and was envisioned to be an "overhead-light brand;" that is, an "asset manager," not "physical producer" of a festival.[31]

---

[25] SACC ¶ 46.

[26] Felts Tr. at 650-51.

[27] Felts Dep. Tr. at 25.

[28] SACC ¶ 45.

[29] Felts Dep. Tr. at 81; SACC ¶ 45; Felts Tr. at 651, 887.

[30] Felts Tr. at 682.

[31] *Id.* at 678.

One of Virgin Fest's early investors was Marc Hagle. Mr. Hagle first became involved in Virgin Fest after attending the 2018 KAABOO Del Mar festival. There, he met Mr. Gordon for the first time, talking briefly with him about the music business.[32] While a very successful real-estate developer, Mr. Hagle had no experience in the music festival business. The 2018 KAABOO Del Mar festival was the first festival he had ever been to.[33] A short time after that festival, Mr. Gordon offered Mr. Hagle an opportunity to become an investor and board member of Virgin Fest.[34] Mr. Hagle agreed.[35] Mr. Hagle went on to attend KAABOO Cayman and KAABOO Dallas.[36]

## D. THE JULY 4TH FINANCIALS

With Mr. Hagle now on Virgin Fest's board, in the summer of 2019, Mr. Gordon first approached him about Virgin Fest potentially acquiring KAABOO Cayman.[37] When KAABOO Cayman's joint venture partner backed out of a deal,[38] Mr. Gordon alternatively proposed to Mr. Hagle an acquisition of KAABOO Del

---

[32]  Hagle Tr. at 970.

[33]  *Id.* at 971.

[34]  *Id.* at 976.

[35]  *Id.*

[36]  *Id.* at 972.

[37]  JX138.

[38]  JX478 at 3027.

Mar.[39]  This proposal appealed to Mr. Hagle because KAABOO Del Mar was not competitive with Virgin Fest's younger market audience and he believed the Virgin Fest brand could extract value from a partnership with an operating festival that had a "good reputation."[40]

On July 4, 2019, KAABOO forwarded a set of KAABOO Del Mar financial results and projections of KAABOO Del Mar to Mr. Hagle (the "July 4th Financials").[41]  Those financials showed historical and projected cash flows, including revenue, cost of revenue, operational expenses, and EBITDA for 2018 actual, 2019 estimated, and 2020-2023 projected financials/forecasts.[42]  Much of trial and the parties' extensive post-trial briefing centered on this two-page document.

### 1.  Preparation of the July 4th Financials

The Court now describes in detail the series of changes KAABOO management made in preparing the July 4th Financials.

Optimistic of future success, KAABOO initially projected a 15% increase in ticket revenue from the prior year in its 2019 budget, resulting in $215,676 profit

---

[39]  Hagle Tr. at 992.

[40]  *Id.* at 993.

[41]  Walker Tr. at 30-31; JX197.

[42]  *See* JX197.

and $15,453,114 in ticket revenue for the 2019 KAABOO Del Mar festival.[43] Yet, after KAABOO Dallas and amidst lagging ticket sales for the 2019 KABOO Del Mar festival, Rick Rosetti, who led KAABOO's forecasting, lowered the projections to a loss of $3.245 million, and $13.020 million in ticket revenue.[44]

With a projected loss of $3.245 million based on the new forecasting, KAABOO employees proceeded to identify $1.009 million in line-item expense reductions.[45] The parties do not dispute that these expense reductions were "bottoms up" and "team-driven."[46]

Next, Robert Walker, KAABOO's chief financial officer, instructed Mr. Rosetti to close "half the gap" in ticket revenue between the updated forecasted numbers and the prior, 2019 budgeted numbers.[47] This resulted in a lower loss figure ($226,091) and $14.236 million in ticket revenue.[48] But Mr. Walker never explained what justified such a change to the ticketing revenue figure, just that management would go through a *post hoc* "process [to] identify" a new marketing

---

[43] JX64; Walker Tr. at 111-14.

[44] JX140; Walker Tr. at 130-131.

[45] JX147 at 2188; Walker Tr. at 133-35; Rosetti Dep. Tr. at 68-73; JX629.

[46] Virgin's Post-Trial Opening Brief ("VOB") at 12 (D.I. 434).

[47] Walker Tr. at 161-63; JX147 at 2190.

[48] Walker Tr. at 161-63; JX147 at 2190-91. To cover its cash flow needs pending a sale of KAABOO Del Mar (referred to in many documents as "KDM"), on June 20, KAABOO sent Shea Ventures, a lender, financials that included the $14.236 million ticket revenue sale number. JX160 at 6032, 6056.

plan.[49]

Management continued to adjust until the numbers forecasted profitability. Seth Wolkov, KAABOO's president and director, instructed Mr. Rosetti to cut an "additional $600k in opex."[50] This change resulted in the financials showing profit for 2019.[51] At trial, neither Mr. Wolkov, nor Mr. Walker, nor Mr. Gordon could explain where these savings came from.[52] A few hours later, Mr. Rosetti offered to reduce "OPEX by an additional $100k" to cover a missed expense item.[53] Mr. Wolkov instead instructed Mr. Rosetti to "[r]educe contingency from $265k to 150k."[54] The contingency funds eventually went down to zero.[55]

About a week before KAABOO provided the July 4th Financials, Mr. Wolkov cut an additional "$250k . . . in expenses" from supposed savings identified by Mr. Gordon.[56] At trial, neither Mr. Wolkov, nor Mr. Walker, nor Mr. Gordon could identify the originating savings.[57] That same day, too, Mr. Wolkov instructed one of

---

[49]   Walker Tr. at 162.

[50]   JX166 at 2317.

[51]   *Id.* at 2319.

[52]   Wolkov Tr. at 474; Gordon Tr. at 1344-45; Walker Tr. at 192.

[53]   JX166 at 2317.

[54]   JX167 at 2403.

[55]   JX187 at 8990.

[56]   *Id.* at 8987.

[57]   Wolkov Tr. at 492; Walker Tr. 199-200; Gordon Tr. at 1356.

the team members to:

> Delete the OPEX and mgmt. fees from 2018 and 2019 as it makes numbers / losses look scary. I suggest having these as zeros and making the footnote instead say KDM was a wholly owned subsidiary and therefore did not allocate fees or expenses in 2018/2019. That way, the losses shown are less in these years.[58]

"OPEX" represented corporate overhead expenses.[59] At first, the number was listed as $1.285 million, and then increased, at Mr. Wolkov's instruction, to $1.35 million.[60] Eventually, and in accordance with Mr. Wolkov's instruction referenced above, the $1.35 million number was removed altogether and replaced with an "N/A" designation, and accompanying footnote.[61]

The $1.35 million in corporate overhead expenses was an underestimate. A few weeks after the July 4th Financials were presented to Mr. Hagle, employees of KAABOO calculated that the corporate overhead should be $2,379,873, based on expenses "for the past 12 months and the portion allocated to [KAABOO Del Mar]."[62] At trial, Mr. Walker did not dispute that the calculation was accurate.[63]

---

[58] JX186 at 8984, 8988.

[59] Walker Tr. at 200-201. Overhead costs were spread out across various departments, including operations, accounting, business development, marketing, management, design, amplify, legal, artwork, ticketing/credentials, production, administrative, talent, F&B, HR, amplify/bask/gear, artist relations, and gear. Boulter Dep. Tr. at 58.

[60] JX186 at 8985.

[61] JX 187 at 8990.

[62] JX641 at 7634; JX221.

[63] Walker Tr. at 201.

On July 4, 2019, KAABOO sent Mr. Hagle its financials.[64] In sum, the financials incorporated the following changes:

(a) $14.236 million in ticket revenue for the 2019 KAABOO Del Mar festival, rather than the anticipated $13.020 million in ticket revenue later forecasted by Mr. Rosetti;[65]

(b) $600,000 in "opex" cuts with no line-item expense reductions;

(c) zeroed-out contingency funds from the original $265,000;

(d) $250,000 in additional "across the board expenses;" and

(e) removal of the corporate overhead fees.

For (e), three line-items for corporate overhead were listed. The first was the KAABOO Opex Reimbursement, marked originally as $1.35 million.[66] The second was the KAABOO Event management fee, which KAABOO was estimating to be 1% of total revenue.[67] The third line-item was the KAABOO incentive fee, for which KAABOO was not proposing any amount at the time.[68]

For each of the three line items, the July 4th Financials included no amount or

---

[64] JX197.

[65] *Cf.* JX140; Walker Tr. at 130-131.

[66] Wolkov Tr. at 359-60.

[67] *Id.*

[68] *Id.*

- 14 -

figure, but instead had the following designation: "N/A," and a footnote.[69]

Footnote (1) stated that: "'KDM was a wholly owned subsidiary and therefore did not allocate fees or expenses in 2018 and 2019. Applicable EBITDA on exit to

---

[69] Here is a partially snipped view of the July 4th Financials. JX197.

| KAABOO Del Mar - Historical and Projected Operating Cash Flow Summary | | |
| --- | --- | --- |
| Year (fiscal year ending 9/30) | 2018 | 2019 |
| REVENUE | Actual | Estimated |
| Passes & Fees | 13,478,791 | 14,236,917 |
| Food & Beverage | 4,355,645 | 5,018,747 |
| Merchandise | 453,621 | 427,377 |
| Parking and Valet | 510,443 | 484,578 |
| Lodging | 281,627 | 15,000 |
| Other Income | 509,759 | 623,879 |
| Corporate Partnerships | 3,207,338 | 3,685,731 |
| Total Revenue | $22,797,224 | $24,492,229 |
| % Growth | | 7.4% |
| COST OF REVENUE | | |
| Passes & Fees | 900,178 | 1,263,069 |
| Food & Beverage | 2,687,541 | 2,873,944 |
| Merchandise | 343,925 | 318,298 |
| Parking and Valet | 195,905 | 197,468 |
| Lodging | 291,595 | - |
| Other Income | 189,911 | 263,189 |
| Corporate Partnerships | 713,255 | 925,988 |
| Total Cost of Revenue | $5,322,310 | $5,841,956 |
| | | |
| Total Gross Profit | $17,474,914 | $18,650,273 |
| % Margin | 76.7% | 76.1% |
| OPERATIONAL EXPENSES | | |
| Talent | 9,725,281 | 8,637,000 |
| Production | 1,439,776 | 1,099,588 |
| Marketing | 1,260,238 | 1,000,000 |
| Operations | 3,931,553 | 3,738,156 |
| Environmental Design | 612,084 | 573,650 |
| General & Administrative | 1,745,075 | 1,010,185 |
| KAABOO Opex Reimbursement (1) | N/A | N/A |
| KAABOO Event Management Fee - Base (1) | N/A | N/A |
| KAABOO Incentive Management Fee (1) (2) | N/A | N/A |
| Staffing & Payroll | 1,553,952 | 1,188,762 |
| Rent | 764,400 | 779,088 |
| Maintenance CapEx | 181,018 | 348,100 |
| Total Operational Expenses | $21,213,377 | $18,374,529 |
| | | |
| EBITDA | ($3,738,463) | $275,744 |
| EBITDA Margin | 0.0% | 1.1% |

a strategic purchaser would be exclusive of management company costs."[70]

With these changes, the July 4th Financials showed the 2019 KAABOO Del Mar festival making a positive EBITDA of $275,744—*i.e.*, a swing of more than $4 million from the previous year.[71]

### 2. Mr. Hagle's Reaction

Mr. Hagle testified at his deposition that upon reviewing the July 4th Financials, his "first impression" was that he could not "realistically trust" the numbers.[72] They were, at least as to the projections after 2019, "fantasy land."[73] In part because of his skepticism, Mr. Wolkov flew out to meet with Mr. Hagle.[74] Mr. Hagle didn't initially believe Mr. Wolkov's explanations, but after speaking with Mr. Gordon, he thought the financials could be accurate.[75]

At trial, Mr. Hagle provided additional details. He testified that he asked Mr. Wolkov about KAABOO's operational expenses, namely, the three items in the July 4th Financials with the designation "N/A."[76] According to Mr. Hagle,

---

[70] *Id.*

[71] *Id.*

[72] Hagle Dep. Tr. at 89-90.

[73] *Id.* at 94. Mr. Hagle clarified in a subsequent affidavit that his skepticism towards the July 4th Financials was in reference to the long-term projections from 2019 into 2020 through 2024, not the 2019 forecast. JX592 ¶¶ 3-4. Mr. Hagle's deposition testimony and later testimony at trial aren't inconsistent with this conclusion.

[74] Hagle Dep. Tr. at 95.

[75] *Id.*; Hagle Tr. at 1169-1170.

[76] Hagle Tr. at 999-1000.

Mr. Wolkov told him that:

> all of the KAABOO overhead, all the expenses, everything that it took to put on this festival is incorporated into the other numbers . . . [so] that when you look at the EBITDA at the end, the EBITDA is truly representative of the total cash surplus or deficit that it took to run the festival during this period of time.[77]

In other words, the N/A designation for corporate overhead represented costs purportedly already baked into the direct costs in the other line items of the financials.[78] Mr. Hagle then confirmed Mr. Wolkov's explanations of the financials with Mr. Gordon over a call.[79] In Mr. Hagle's view, Mr. Wolkov "laid the groundwork," and Mr. Gordon "closed the deal."[80]

Mr. Hagle's contemporaneous handwritten notes and Mr. Walker's and Mr. Wolkov's testimony of the July 4th Financials, however, paint a different picture.[81] According to Mr. Walker, the July 4th Financials represented an "event-level" forecast, thus requiring a prospective buyer to assign its own overhead—or if it hired KAABOO to produce the company, negotiate overhead fees with KAABOO.[82] In apparent consistency with this characterization, below the footnote,

---

[77] *Id.*

[78] *Id.* at 1000-1001.

[79] *Id.* at 1004, 1014.

[80] *Id.* at 1170-71.

[81] JX598; Hagle Tr. at 995.

[82] Walker Tr. at 243-44.

Mr. Hagle hand-wrote, "→ <1,575,000> Add Back Opex & Mgmt Fee at 2%."[83]  In

the right-hand margin, he wrote "No Fee or overhead to K[AABOO] mgmt."[84]  But,

in the left-hand margin, circling the three corporate overhead items, he wrote "Direct

Hard Cost inc corp admin."[85]

In an email to Mr. Walker, Mr. Gordon, and Robert Fraiman (who was a

KAABOO board member at the time), Mr. Wolkov described his meeting with

Mr. Hagle, writing:

> KDM DD - talked a lot about the kdm numbers. Grilled me on
> attendance contraction, Sunday numbers, cash flow losses, customer
> retention rates, historical numbers, ability to grow in future, growth
> assumptions, customer demos, etc . . . And, didn't care about positive
> working capital at the event level with talent loans and ticket presales
> as he said capitalization for virgin fest wasn't at all an issue.[86]

Mr. Wolkov and Mr. Hagle also discussed potential management contracts

between KAABOO and Virgin Fest.  In the same email, Mr. Wolkov reported that:

> Mgmt Contract. He did mention a question mark around the future roles
> in managing the kb mgmt co, and whether or not [Mr. Gordon] and [Mr.
> Felts] would continue in their roles with kaaboo going forward or be
> doing virgin fest full time. I said I did not know anything about that
> potential situation, especially with regards to [Mr. Gordon], as he was
> the largest shareholder in kaaboo. The topic came up as we discussed
> the stability of the future mgmt co for virgin fest deals and other
> kaaboo's going forward, which makes perfect sense as we build a long

---

[83]   JX598.

[84]   *Id.*

[85]   *Id.*

[86]   JX210.

term partnership together.[87]

Mr. Wolkov's takeaway from his meeting was that Virgin Fest had "definite interest," but he was "uncertain" that they could "find a deal that meets both companies mutual objectives (especially considering kaboo's cash needs)."[88]

After meeting with Mr. Wolkov and Mr. Gordon, Mr. Hagle received from Mr. Gordon a list of twelve topics to address in a draft letter of intent.[89] On July 31, Mr. Gordon received a draft letter of intent ("LOI") from Virgin Fest.[90]

### E. KAABOO AGREES TO PRODUCE VIRGIN FEST LOS ANGELES.

That same day, KAABOO agreed to produce a Virgin Fest-branded music festival in 2020 in Los Angeles through a Master Services Agreement (the "MSA").[91] The MSA contained the following warranty and representation:

> All services will be performed in a competent and professional manner, by qualified personnel and will conform to [Virgin Fest Los Angeles'] requirements hereunder;[92]

The MSA had a 5-year term and was terminable upon any material breach.[93] The MSA provided for a fee schedule of $1,200,000 for the production of the 2020

---

[87]  *Id.*

[88]  *Id.*

[89]  JX219.

[90]  JX229.

[91]  JX230 ("MSA").

[92]  MSA § 6.3.

[93]  *Id.* §§ 7, 8.

Virgin Fest Los Angeles event.[94]

## F. THE PARTIES FINALIZE THE LOI.

With the 2019 KAABOO Del Mar festival about a month away, Mr. Hagle sent Mr. Wolkov another draft LOI for the acquisition of KAABOO Del Mar.[95] The draft contemplated, *inter alia*, a $10 million purchase price for that festival and an agreement to enter into ten-year management contracts for additional festivals.[96] Mr. Felts expressed his support for the deal and advised Mr. Hagle to "stay firm on this offer. This is a great deal for KAABOO."[97] Numerous drafts were exchanged, including a proposal to convert $2 million of the $10 million purchase price into a senior bridge loan.[98]

On August 7th, Mr. Walker emailed the KAABOO board members—including Mr. Felts—attaching a cash projection and stating that "next week is critical with the upcoming talent deposits due" the following week.[99] At the board meeting that morning, Mr. Wolkov reported on the sale process.[100] He said that the

---

[94] *Id.* at 10.

[95] JX240.

[96] *Id.* §§ 2, 9.

[97] JX239.

[98] *See, e.g.*, JX245, JX251, JX253, JX254, JX255.

[99] JX242.

[100] JX514 at 6677.

only offer KAABOO had received was from Virgin Fest,[101] and that KAABOO needed a minimum of $2 million to pay talent and venue deposits by the following week.[102] If KAABOO was unable to meet the deadline, Mr. Fraiman and Mr. Wolkov proposed seeking bankruptcy counsel.[103]

Shortly thereafter, Mr. Felts reported this information in an email to Mr. Hagle with the subject line "Intel," and the heading "Confidential" above the email's body.[104] Mr. Felts wrote that "KAABOO DEL MAR has immediate cash needs with some significant talent deposits due early next week . . . Believe we are in poll position in terms of speed (maybe not purchase price) . . . In my opinion, we move quick if they come back, so we make initial deposit and lock ourselves into an exclusive diligence period etc etc."[105]

To meet one of Virgin Fest's conditions to a deal, Mr. Walker requested one of its lenders, Gemini Finance Corp. ("Gemini"), to subordinate its loan to Virgin Fest's proposed $2 million loan.[106] Gemini wrote back that "subordinating without any consideration is a nonstarter for us."[107] After a call with Gemini, Mr. Walker

---

[101] *Id.* at 6678.

[102] *Id* at 6678-79.

[103] *Id.* at 6679.

[104] JX241.

[105] *Id.*

[106] JX256.

[107] JX258 at 1048.

reported to Mr. Gordon that they had obtained Gemini's "verbal consent" to subordinate Gemini's loan to Virgin's proposed loan.[108] For Gemini's consent, KAABOO would pay Gemini an extra "$150k; $75k this week and $75k at payoff."[109]

On August 12th, two days before the first deposits became due, the KAABOO board held a telephonic meeting and reviewed the company's financial position.[110] The situation looked dire:

- Remaining production costs were approximately $6.7 million.[111]

- Approximately $10.2 million in revenue from the ticket proceeds of the 2019 KAABOO Del Mar festival had already been used up.[112]

- If KAABOO missed the August 14th deadline, it would likely need to cancel the festival and refund the $10.2 million in revenue from ticket sales and sponsorships.[113]

- KAABOO still owed $1.8 million in vendor payables from the 2018 KAABOO Del Mar festival.[114]

- The deal to sell KAABOO Cayman to Virgin Fest fell through, resulting in a loss of $2.5 million in potential sale proceeds and the

---

[108] JX261.

[109] JX289.

[110] JX267.

[111] *Id* at 2.

[112] *Id.*

[113] *Id.* at 1, 5.

[114] *Id.* at 2.

future production services contract.[115]

- To date, KAABOO had been unable to secure any offers for a bridge loan;[116] and

- slower pass sales represented an approximate $1 million reduction from the previous year.[117]

At the conclusion of the board meeting, Mr. Wolkov and Mr. Fraiman, followed by the full Board, approved the LOI and Loan and Security Agreement (the "Loan Agreement") to be entered into with Virgin Fest.[118] With these, KAABOO met the talent and venue deposit deadlines.[119]

## G. TERMS OF THE LOI AND LOAN AGREEMENT

Pursuant to the LOI and Loan Agreement, Virgin Fest provided a $2 million deposit that would apply to the $10 million purchase price of KAABOO Del Mar (the "Bridge Loan").[120] The LOI stated that the Bridge Loan would be repaid "prior to payment of any other loans, fees," and KAABOO would disclose "any and all existing financing," and provide "subordination agreements."[121]

---

[115] *Id.*

[116] *Id.* at 3.

[117] *Id.* at 5. Specifically, on August 8, Mr. Wolkov asked Mr. Rosetti to update the KDM forecast based on the "current sales velocity curve." JX246. In contrast to the 2019 forecast in the data room, the new forecast showed estimated ticket revenue to be $13,244,260 and a negative EBITDA of $719,360. *Id.*

[118] JX267 at 6-7; JX275; JX277.

[119] Walker Tr. 61; JX267 at 4.

[120] JX275 § 2(a); JX277 § 2.5; JX267 at 3.

[121] JX275 § 2(a)(i).

The LOI contemplated an additional $2 million for future festivals in Florida and Las Vegas and an agreement to enter into ten-year term management contracts to produce three other Virgin Fest-branded events.[122]

The LOI provided for a due diligence period of seven business days.[123] If at the end of seven business days Virgin Fest gave notice of termination of the LOI, the initial deposit would continue as a secured bridge loan.[124] If there was no notice to terminate, the Loan Agreement cancelled the loan upon the closing of the transaction and the proceeds would apply to the purchase price.[125]

Following the execution of the LOI, the parties were to engage in good faith negotiation of a binding asset purchase agreement.[126] Until the execution of such, the LOI was "non-binding."[127]

## H. THE DUE DILIGENCE PERIOD

The due diligence process took place for seven days and ended on August 20.[128] On August 16th, Tobin Armbrust, Virgin Fest's Chief Strategy Officer, identified to Mr. Hagle the relevant documents in the data room that were responsive

---

[122] JX275 §§ 2(b), 9.

[123] *Id.* § 3(a).

[124] *Id.*

[125] JX277 § 2.5.

[126] JX275 § 11.

[127] *Id.* § 12.

[128] *See* JX275 § 3; JX295.

to the diligence questions list, including historical pass sales from 2015 to present.[129]

Those documents reflected that ticket revenue as of August 15, 2019, lagged behind the 2018 ticket revenue as of the same time the previous year.[130] Mr. Hagle also met with Mr. Gordon and Mr. Felts.[131] His handwritten notes of the meetings reflect that KAABOO needed $11 to 13 million before September 10.[132]

## I. VIRGIN FEST STANDS DOWN ON THE LOI.

On September 6, 2019, KAABOO's Board members, including Mr. Felts, received a package of materials, including a draft asset purchase agreement, event forecast, ticket sale velocity and weekly cash plan update.[133] The updated event forecast anticipated ticket sales of $13,244,260—down from $14,236,918 in the July 4th Financials—and a negative $734,222 in total net cash flows."[134] Later that day, Mr. Gordon postponed the board's meeting due to "a number of material open business issues with Virgin Fest."[135] After a disagreement with Mr. Gordon regarding a non-compete provision,[136] Mr. Felts emailed Mr. Hagle:

He doesn't get it. Is [Mr. Gordon] still thinking that Virgin fest is

---

[129] JX296.

[130] JX660.

[131] JX319.

[132] *Id.* at 2.

[133] JX367.

[134] *Id.* at 83-84.

[135] JX364.

[136] JX366 at 2.

looking to proceed with the KAABOO Del Mar transaction? Can we please clarify this and get the letter notice sent over to them as we discussed? I truly think that the perception is still that Virgin Fest is working to acquire KAABOO….”[137]

That same day and one week before the festival, Mr. Hagle sent a letter, stating that Virgin Fest has “instructed our attorneys to stand down on this matter” and requested that KAABOO “repay the Loan plus interest in full as soon as possible.”[138] Without the loan, Messrs. Walker and Wolkov “didn’t know how [they] were going to be able to execute on the festival.”[139]

## J. THE DEAL REVIVES (TWICE).

Three days before the festival, Mr. Felts wrote to Mr. Gordon and Mr. Hagle with proposed terms for a revived deal.[140] The terms included, in part: (a) an $8 million note from Fortress Investment Group (“Fortress”); (b) acquisition of all KAABOO, including KAABOO Del Mar, brand, and pipeline of future events for $3 million in Virgin Fest equity; (c) release of Mr. Felts’s non-compete; (d) management contracts for KAABOO to produce Virgin Fest events; and (e) removal of Mr. Gordon at Virgin Fest as a manager.[141]

Mr. Felts proposed an in-person meeting in Los Angeles for the next day to

---

[137]  *Id.*

[138]  JX369 at 2.

[139]  Walker Tr. at 75; Wolkov Tr. at 376-77.

[140]  JX376.

[141]  JX615.

discuss the terms.[142]  Mr. Hagle agreed.  And before flying out to Los Angeles, Mr. Hagle insisted on receiving Fortress's contact information before 6 p.m. that day.[143]  He was assured that Mr. Gordon would have the information.[144]  Mr. Hagle flew from Florida to Los Angeles, but Fortress was a "no show."[145]  At that point, Mr. Hagle told Mr. Gordon that Virgin Fest was out.[146]  At trial, Mr. Hagle testified that:

> The meeting ended with [Mr. Gordon] coming over to me and standing two inches from my face and threatening me . . .  He suggested to me that Virgin Fest was going to die; [Mr. Felts] was not going to be able to work going forward; and that he was going to make sure that Richard Branson got embarrassed; and the Virgin Fest brand would be no good forever and we'd never be able to raise any money.[147]

On Mr. Hagle's flight back, Mr. Gordon called to apologize and Mr. Hagle agreed to fund the acquisition.[148]  After that call, Mr. Hagle wired the funds to vendors and other third parties.[149]

## K.  THE PARTIES ENTER INTO THE APA.

One day before the festival, on September 12th, the parties executed the Asset

---

[142]  JX378 at 2.

[143]  *Id*.

[144]  *Id*.

[145]  Hagle Tr. at 1067-9.

[146]  *Id.* at 1075-6.

[147]  *Id.* at 1076.

[148]  *Id.* at 1077-80.

[149]  *Id.* at 1081.

Purchase Agreement ("APA").[150] Through the APA, Virgin Fest purchased substantially all of KAABOO's assets.[151] Too, the APA contained the following representations concerning KAABOO:

> [N]o Seller has any Liabilities related to the Business that are of a nature required to be disclosed on a balance sheet prepared in accordance with generally accepted principles….[152]

And:

> To Sellers' Knowledge, no representations or warranties by Sellers in this Agreement, nor any other Transaction Document or other document, exhibit, statement, certificate or schedule or other information (financial or otherwise) furnished to Buyer in connection with the transactions contemplated hereby contains any untrue statement of a material fact, or, to Sellers' Knowledge, omits any material fact necessary to make the statements or facts contained therein not misleading.[153]

The APA provided Virgin Fest with indemnification for any "breach or inaccuracy of" these representations.[154] The APA placed a $2 million cap on these claims.[155]

---

[150] JX398 (the "APA").

[151] *Id.* § 1.01.

[152] *Id.* § 3.05. The APA defines "Sellers" to include KAABOO LLC, KAABOO Management LLC, KB Eventpro, LLC, KAABOO-Del Mar LLC, KAABOOWorks Services, LLC, KAABOO Contract Services, LLC, and KAABOO Works, LLC.

[153] *Id.* § 3.10.

[154] *See id.* § 6.02(a)(i).

[155] *Id.* § 6.02(b)(i) ("The aggregate amount of all payments made by Sellers in satisfaction of claims for indemnification pursuant to Section 6.02(a)(i) shall not exceed $2,000,000.")); *see also id.* § 6.06 (providing that the indemnification provisions are the "exclusive provisions in this Agreement with respect to the liability of Sellers and Buyers for the breach, inaccuracy or

The APA also required that KAABOO apply all 2019 KAABOO Del Mar festival income to any 2019 Del Mar Festival Liabilities.[156] And, Mr. Gordon agreed to guarantee the payment of all 2019 Del Mar Festival Liabilities as of April 1, 2020.[157]

## L. THE PARTIES ENTER INTO THE PRODUCTION SERVICES AND ENGAGEMENT AGREEMENTS.

As required in the APA, at closing, KAABOO delivered to Virgin Fest an executed Production Services Agreement for the production of future festivals (the "PSA"), and a Services Engagement Letter (the "Engagement Agreement" and together with the MSA and PSA, the "Management Contracts").[158]

Under the PSA, KAABOO would produce an annual festival in the San Diego area for a period of ten years unless terminated earlier pursuant to the Engagement Agreement.[159] Virgin Fest would pay an annual $1,290,000 turnkey fee.[160] In

---

nonfulfillment of any representation or warranty or any covenants, agreements or obligations contained in this Agreement….").

[156] *Id.* § 1.08(c). APA § 1.04 defines 2019 Del Mar Festival Liabilities to mean "any and all Liabilities (including all accounts payables as well as Taxes) arising from or relating to the ownership, operation, promotion, production and exploitation of the '2019 KAABOO Del Mar Festival' scheduled to be held in San Diego, California on September 13, September 14, and September 15, 2019."

[157] *Id.* § 7.16(a).

[158] *Id.* § 2.02(a)(vii) and (x); *id*. Ex. E ("PSA"), and *id*. Ex. G ("Engagement Agreement").

[159] PSA Recitals, §§ 1, 3. The Engagement Agreement also extended the term of the MSA to ten years. Engagement Agreement § 7(a).

[160] PSA § 2(c)(i).

addition, KAABOO was to receive: (a) an event management fee equal to three percent of estimated revenue; (b) an incentive management fee based on cash flow achievements; and (c) reimbursement of certain third-party costs.[161]

The PSA required that KAABOO:

provide everyone and everything necessary for the production of each Event, including, without limitation, such personnel and administrative, production, supervisory and other related services consistent with the first-class manner that [KABOO] or any of its applicable affiliates have previously produced those events.[162]

The Engagement Agreement similarly required that KAABOO "has, and will continue to have, the assets, employees and other capabilities necessary to fully perform its services under the [PSA and MSA]."[163]

The parties consolidated the termination rights for the PSA and MSA in the Engagement Agreement. The Engagement Agreement provided that the Management Contracts may be terminated by:

*Cause* – by either party, in whole or in part, upon providing written notice to the other party thereto, if the other party thereto breaches any of the terms and conditions of this Agreement or the [PSA and MSA] in any material respect, and the breaching party has not cured such breach within thirty (30) business days following written notice thereof by the non-breaching party.[164]

---

[161] *Id.* § 2(a), (b), (c)(ii).

[162] *Id.* § 1(a).

[163] Engagement Agreement § 4.

[164] *Id.* § 5(b)(i).

## M. THE KAABOO DEL MAR FESTIVAL TAKES PLACE —THEN COME THE LAYOFFS.

On September 13, 2020, the "big party" finally happened — and it seemed to go off "without a hitch."[165]   It was "successful operationally," "safe[ly] execut[ed] without incident," and "well reviewed."[166]  "Consumers were happy," and from a brand perspective, "it was great."[167]  But the festival didn't turn a profit.[168]  The festival generated only $13,136,138 in ticket revenue—2.5% less than the previous year—and expenses were likely going to be higher than originally forecasted.[169]

With the Del Mar party now over, soon too would be Virgin Fest's and KAABOO's business partnership.  As they began planning for the next year's festivals, new issues quickly emerged.

First, Virgin Fest and KAABOO disagreed as to whether the PSA required KAABOO to provide ticketing and VIP services.[170]  Second, less than a week after the 2019 event, Virgin Fest became aware that KAABOO intended to dismiss several key members of its staff.[171]  This prompted Virgin Fest's counsel to send an email to

---

[165]  Felts Tr. at 738.

[166]  Walker Tr. at 91.

[167]  Felts. Tr. at 738.

[168]  Plaintiffs' and Counterclaim Defendants' Opening Post-Trial Brief ("KOB") at 34.

[169]  JX574.

[170]  Walker Tr. at 91-92; JX422; JX423; Felts Tr. at 787-788.

[171]  JX422.

KAABOO communicating its concerns.[172] As feared, by September 23, KAABOO laid off eighteen employees (in comparison to eight in June after the outcomes of KAABOO Cayman and KAABOO Dallas) and terminated nine consultants.[173] One of the consultants led KAABOO's iconic mural program.[174] KAABOO doesn't dispute that the September layoffs involved the termination of many senior staff and was more than double the number from the summer after KAABOO Cayman and KAABOO Dallas.[175] By mid-October, KAABOO would reduce its staff to approximately 35 full-time workers, instead of the approximately 50 it had earlier in the summer.[176]

In October, KAABOO proposed designating Mr. Gordon's daughter to serve

---

[172] *Id.*

[173] JX538 at 54; JX178. In JX178, Mr. Gordon and Mr. Wolkov confirm the accuracy of a draft press release announcing the termination of eight employee positions.

[174] Gordon Tr. at 1287.

[175] The other employee dismissals appear to have included persons serving in the following positions: (1) SVP – Corporate Operations, (2) SVP – Business Development, (3) VP – Corporate Operations, (4) VP – Event Operations, (5) VP – Food & Beverage, (6) VP – Amplify Sales & Hospitality, (7) Director – Ticketing & Credentials, (8) Creative Director/Sr. Graphic Designer, (9) Partner Operations Manager, (10) Environmental Design Project Coordinator, (11) Manager – Artwork Sales & Operations, (12) Sales Manager, (13) Business Affairs Manager, (14) Corporate & Hospitality Sales Manager, (15) Manager – Culinary Business Dev. & Programming, (16) Data Analyst. *See* JX538 (cross referencing JX154). In comparison, the June lay-offs involved termination of the following positions: (1) Senior Associate – Corporate Development, (2) Director – Amplify & Bask Operations, (3) Group Sales Representative, (4) Senior Staff Accountant, (5) Graphic Designer, (6) Marketing Coordinator, (7) Amplify Guest Services Representative. *See* JX178 (cross referencing JX154).

[176] Compl. ¶ 74; JX538 at 12, 45.

as "Co-Manager."[177] Virgin Fest expressed its concerns with Mr. Gordon's daughter's ability to serve in that new role, citing her lack of managerial experience.[178] As an alternative, Nate Prenger, who previously served as General Manager at KAABOO, and was then working at Virgin Fest,[179] proposed serving as the overall General Manager on a three-member team that included Ms. Gordon.[180] He proposed a fee reduction on KAABOO's part due to his added role.[181] KAABOO didn't agree to the reduction.[182]

KAABOO also sent invoices to Virgin Fest, calculating a $71,680 amount based on 3% of estimated revenue, and one of the monthly installments of the turnkey fee for $107,500.[183] The same day, KAABOO sent an invoice for Virgin Fest Los Angeles pursuant to the MSA.[184]

### N. Virgin Fest Sends the October 18 Letter.

On October 18th, Mr. Felts left a voicemail for Mr. Wolkov stating that "they're going to be terminating the [KAABOO] engagement," and that he would

---

[177] JX450 at 7002.

[178] Prenger Dep. Tr. at 172.

[179] Shepperd Tr. at 268.

[180] JX462.

[181] *Id.*

[182] *Id.*

[183] JX445.

[184] JX448.

be sending out a letter shortly.[185]   Later that day, Mr. Felts emailed a letter to Mr. Gordon and Mr. Wolkov that identified alleged defaults under the relevant agreements and proposed that the parties "mutually and amicably terminate the Agreements as of October 1, 2019."[186]  The letter concluded with the following:

> For the avoidance of doubt, this letter shall constitute notice of default pursuant to each of the Agreements, and all of VF's rights are hereby expressly reserved.[187]

After receiving the letter, KAABOO terminated its remaining employees and didn't pay the vendors it owed.[188]

## IV.  THIS LITIGATION AND THE PARTIES' CONTENTIONS

Within a month, KAABOO and its affiliates filed its complaint against Virgin Fest and its affiliated entities.  KAABOO brought three claims; only two survived to trial.[189]   Its first charges breach of contract under the APA, MSA and PSA. KAABOO also brings an accompanying implied covenant of good faith and fair dealing claim.[190]

Virgin Fest answered, leveled eight counterclaims, and added Mr. Gordon as

---

[185]  JX503; Felts Dep. Tr. at 87.

[186]  JX501 at 4.

[187]  *Id.*

[188]  Walker Tr. at 99.

[189]  The Court dismissed KAABOO's tortious interference claim. D.I. 109.

[190]  *See* Compl. ¶¶ 85-98.

a counterclaim defendant.[191]  In response, Mr. Gordon filed his own counterclaim against Virgin Fest.  Through it he seeks payment in connection with his agreement to resign from Virgin Fest after the 2019 KAABOO Del Mar festival (the "Gordon Side Agreement").[192]  Virgin Fest followed with an amended and supplemental answer with a total of 14 counterclaims (including claims for fraud) and now adding Mr. Wolkov and Mr. Walker as defendants.[193]  Virgin Fest's fraud claims survived KAABOO's later motion to dismiss and were pressed at trial.[194]

The Court denied a KAABOO judgment-creditor's motion to intervene in this action.[195]

Virgin Fest eventually filed its Second Amended and Supplemental Answer and Counterclaims ("Second Amended Counterclaims").[196]  Virgin Fest's Second Amended Counterclaims upped the counterclaims to fifteen.  Counterclaims One through Seven, Twelve, and Fourteen are contractual claims relating to the APA and Management Contracts.  Counterclaims Nine through Eleven are claims for fraud and civil conspiracy.  Counterclaims Eight and Thirteen are contractual claims aimed

---

[191] D.I. 13.

[192] D.I. 49.

[193] D.I. 78.

[194] D.I. 109.

[195] D.I. 186.

[196] D.I. 227.

at Mr. Gordon pursuant to APA Section 7.16 (the "the Gordon Guarantee"). And Counterclaim Fifteen is for breach of the LOI and Loan Agreement.

With trial pending, both Virgin Fest and KAABOO filed unsuccessful motions for summary judgment.[197]

Trial was held over seven days from October 23 to November 1, 2023. Post-trial briefing was filed and is now completed.

In sum, KAABOO seeks $84.5 million in damages. While Virgin Fest seeks fraud-based damages in the amount of $11.810 million plus punitives.

## V.  GENERAL LEGAL PRINCIPLES

Though the Court sits without a jury, it has applied the same principles of law in its deliberations and consideration of each individual claim and counterclaim that it would have more formally instructed a jury to follow. The Court may in this writing highlight some of those most applicable to this particular case. But the fact that some particular point or concept may be mentioned here should not be regarded as any indication that the Court did not—during its deliberations—consider all legal principles applicable to this case and to the parties' claim, counterclaims, and defenses.

In reaching its verdict, the Court has examined all exhibits submitted and considered the testimony of all witnesses, both direct and cross, live and by

---

[197] D.I. 345; D.I. 346; D.I. 365.

deposition. The Court has also considered the applicable Delaware case law that has defined the legal precepts applicable to the claims and defenses the parties have forwarded. The Court has applied the Delaware Rules of Evidence to the testimony and exhibits and only used for its deliberation that which would be allowed under those rules—consistent with the Court's knowledge of those rules and the specific rulings that may have been made and articulated both pre-trial and during the trial proceedings. And, of course, the Court has considered each party's respective arguments on the weight to be accorded the testimony and evidence.

The Court then reviewed and applied some of the very instructions that it would give a jury in these circumstances.[198]

## VI. ANALYSIS AND FINDINGS

The Court first addresses Virgin Fest's fraud claims, followed by the parties' competing contractual claims. Additional facts are included now where needed but the Court will, where possible, seek to avoid repetition. On the key disputed points, the Court had to make certain difficult and nuanced credibility determinations in deriving its factual findings from the testimony of Messrs. Walker, Wolkov, Gordon, Hagle and Felts.[199]

---

[198] *See, e.g.,* Del. Super. Ct. Civ. Pattern Jury Instr. 4.1 (Burden of Proof by a Preponderance of the Evidence); *id.* at 4.2 (Evidence Equally Balanced); *id.* at 23.1 (Evidence—Direct or Circumstantial); *id.* at 23.9 (Credibility of Witnesses—Weighing Conflicting Testimony); *id.* at 23.10 (Expert Testimony).

[199] Ms. Sheppard's limited testimony didn't pose nearly the same challenge.

Mr. Hagle and Mr. Felts described themselves as neophytes to the financial workings of the music festival industry. But Mr. Hagle was a sophisticated businessman, and the record shows that he closely scrutinized the financials and likely was likely well-aware of the financial peril KAABOO was facing. Too, Mr. Felts was closely engaged in negotiations and had much at stake in a deal, despite portraying himself narrowly as the "brand guy" with a limited role at KAABOO.

On the other side, Mr. Gordon's testimony was largely self-serving and unreliable. He praised the capabilities of his daughter and KAABOO staff, but offered little evidence to support his beliefs when balanced against the economic and managerial challenges facing KAABOO. He also portrayed himself as an innocent bystander who tried to wall himself off in negotiations due to his dual fiduciary roles at Virgin Fest and KAABOO. But, like Mr. Felts, he was a major driver of negotiations. Mr. Walker and Mr. Wolkov in large part followed Mr. Gordon's lead.

For these reasons, the Court found the parties' testimony on the key disputed points far less helpful than the evidence of contemporaneous communications and documentation.

## A. VIRGIN FEST'S CLAIMS

Virgin Fest's claims fall into two categories. Counterclaims Nine through Eleven charge fraud and civil conspiracy. The Court will address these claims first. Next are the contractual counterclaims One through Eight and Twelve through

Fifteen.  These claims relate to the APA, the Management Contracts, the LOI and

Loan Agreement and make various requests for declaratory relief.

### 1.  Virgin Fest's Fraud Claims: the July 4th Financials

Virgin Fest contends that KAABOO committed fraud.  Fraud requires:

> (i) a false representation of material fact; (ii) the knowledge or belief that the representation was false, or made with reckless indifference to the truth; (iii) an intent to induce another party to act or refrain from acting; (iv) the action or inaction taken was in justifiable reliance on the representation; and (v) damage to the other party as a result of the representation.[200]

A party must prove each element by a preponderance of the evidence.[201]

### a.  *The July 4th Financials were false.*

Fraud may occur as (1) an overt misrepresentation; (2) deliberate concealment

of material facts; or (3) silence in the face of a duty to speak.[202]  Deliberate

concealment has occurred if a defendant "took some action affirmative in nature

designed or intended to prevent, and which [did] prevent, the discovery of facts

---

[200] *Infomedia Grp., Inc. v. Orange Health Sols., Inc.*, 2020 WL 4384087, at *3 (Del. Super. Ct. July 31, 2020) (citation omitted); *see also Morris v. Thayer*, 1991 WL 244235, at *2 (Del. Ch. Nov. 15, 1991).

[201] *NetApp, Inc. v. Cinelli*, 2023 WL 4925910, at *12 (Del. Ch. Aug. 2, 2023), *judgment entered,* (Del. Ch. 2023).  Though there is some dispute as to whether a clear and convincing standard applies, the weight of authority suggests—and this Court here applies—a preponderance of evidence standard.  *See id*. n.168 (citing *Arwood v. AW Site Servs., LLC*, 2022 WL 705841, at *21 (Del. Ch. Mar. 9, 2022)); *Stone & Paper Invs., LLC v. Blanch*, 2021 WL 3240373, at *26 (Del. Ch. July 30, 2021); *Roma Landmark Theaters, LLC v. Cohen Exhibition Co. LLC*, 2021 WL 2182828, at *8 n.12 (Del. Ch. May 28, 2021); *Trascent Mgmt. Consulting, LLC v. Bouri*, 2018 WL 4293359, at *17 (Del. Ch. Sept. 10, 2018)).  No matter.  Under either standard, the outcome here is the same.

[202] *In re Am. Int'l Grp., Inc., Consol. Deriv. Litig.*, 965 A.2d 763, 804 (Del. Ch. 2009), *aff'd sub nom. Tchrs.' Ret. Sys. of La. v. PricewaterhouseCoopers LLP*, 2011 WL 13595 (Del. Jan. 3, 2011).

giving rise to the fraud claim[;] some artifice to prevent knowledge of the facts[;] or some representation intended to exclude suspicion and prevent inquiry."[203] The duty to speak arises "if, before the consummation of a business transaction, [the party] acquire[d] information that [he] knows will make untrue or misleading a previous representation that when made was true."[204]

The July 4th Financials were false. KAABOO management made a series of unsubstantiated decisions that rendered the July 4th Financials inaccurate. And, when Mr. Walker or Mr. Wolkov received new information that they knew yielded these inaccuracies, they never disclosed that information to Virgin Fest.

First, the July 4th Financials didn't accurately represent estimated ticket revenue. Mr. Rosetti informed Mr. Walker that ticket revenue projections were lower than the original budgeted amount.[205] Nonetheless, Mr. Walker told Mr. Rosetti to lower projections by only half the difference between the old and newly forecasted amounts.[206] At trial, Mr. Walker testified that the forecast, or as he called it, "scenario," was one of many, and that management believed it could justify the

---

[203] *Maverick Therapeutics, Inc. v. Harpoon Therapeutics, Inc.*, 2020 WL 1655948, at *26 (Del. Ch. Apr. 3, 2020) (brackets in original) (internal quotation marks omitted); *see Lock v. Schreppler*, 426 A.2d 856, 860 (Del. Super. Ct. 1981).

[204] *Maverick*, 2020 WL 1655948, at *29 (brackets in original).

[205] JX140; Walker Tr. at 130-31.

[206] Walker Tr. at 161-63; JX147 at 2190.

projection by an improved marketing plan.[207]  While it is conceivable that an improved plan could achieve the ticket revenue Mr. Walker was projecting, he provided no convincing testimony nor did any contemporaneous communications reveal that these changes to the financials were anything but arbitrary and born by the need for a sale.

Second, the July 4th Financials didn't accurately represent operating expenses. Mr. Wolkov cut "600k in opex," and at Mr. Gordon's request, an additional "250k . . . in expenses."[208]  The July 4th Financials also stripped out any "contingency" as a line item.[209]  Not one witness could identify the source of the savings justifying these cuts.[210]  In contrast, previously, KAABOO employees identified approximately $1 million in line-item expense reductions with supporting documentation.[211] Mr. Wolkov and Mr. Gordon's top-down changes rendered the July 4th Financials inaccurate.

Third, because costs for corporate overhead were not included, the July 4th Financials didn't accurately state the applicable EBITDA.  Mr. Walker posited that the July 4th Financials were an "event level P&L," and thus, "a buyer is going to

---

[207]  Walker Tr. at 162, 245-248.

[208]  JX166 at 2317, 2319; JX187 at 8987.

[209]  *See* JX197.  Mr. Walker suggests that this money was shifted over to another category.  Walker Tr. at 198.  The Court didn't find this "shift" explanation credible.

[210]  Wolkov Tr. at 472, 492; Walker Tr. at 192, 199-200; Gordon Tr. at 1344-45, 1356.

[211]  JX629.

have either their internal cost covered that they're going to factor into their analysis or they are going to hire us based on the fee structure that we reflected in those outer years. It's not going to be based on actuals. This is a buyer pro forma."[212]  But nowhere does the document include that language.  Instead, the document's description is headed as "KDM Summary Financials and Key Operating Metrics."[213]

Nor does the supposed clarifying footnote help.  That footnote states that KAABOO Del Mar didn't allocate fees or expenses in 2018 and 2019 because it was a wholly owned subsidiary.[214]  It further states that "[a]pplicable EBITDA on exit to a strategic purchaser would be exclusive of management costs."[215]  But by July 4, KAABOO still operated KAABOO Del Mar, and an "N/A" designation suggests that corporate overhead was already integrated in the other numbers for 2019.  The fact that KABOO Del Mar "did not allocate fees or expenses in 2018 and 2019" raises the same reasonable inference.

If not suffering facial inaccuracy, the footnote is, at very best, intentionally vague and the omission of the corporate overhead costs constitutes a deliberate act of concealment.  Communications and testimony confirm that the actual spend on KAABOO Del Mar corporate overhead was at least $1 million greater than initially

---

[212]  Walker Tr. at 202, 204.

[213]  JX197.

[214]  *Id.*

[215]  *Id.*

documented.[216] Omitting this information—and refusing to disclose it later—was a deliberate act of concealment of material facts. Indeed, Mr. Walker requested to "delete the OPEX . . . as it makes numbers/losses look scary . . . " and doing so would make "losses shown [to be] less."[217]

For these reasons, Virgin Fest has satisfied the first element of fraud with respect to the July 4th Financials.

### b. *KAABOO Management knew the representations were false.*

The second element of fraud requires knowledge of the falsity of the representation or that the representation was made with reckless indifference to the truth.[218] Virgin Fest has proven that KAABOO management knew the July 4th Financials were false. Mr. Wolkov and Mr. Gordon lowered the operating expense numbers without justification, having no savings to point to. Mr. Walker inflated ticket revenue numbers on the basis of an illusory marketing plan.[219] With four years of experience operating KAABOO Del Mar and having never produced any profits, KAABOO management was pretending that year five would produce a near $4 million swing in cash flow. Virgin Fest has thus satisfied element two.

---

[216] JX641 at 7634; JX221; Walker Tr. at 201.

[217] JX186 at 8984, 8988.

[218] *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829, at *32 (Del. Ch. Dec. 3, 2018).

[219] Walker Tr. at 162.

### c. *KAABOO Management intended for Virgin Fest to rely on the July 4th Financials.*

The third element of fraud requires that the false statements were made with an intent to induce another party to act or refrain from acting.[220] Direct evidence is not necessary but proving motive and opportunity for inducement suffices.[221] The "transaction itself may serve as both the motive and opportunity to commit the fraud."[222]

KAABOO had a motive to commit fraud. KAABOO management was under pressure to push through a sale of KAABOO Del Mar, and Mr. Hagle was an interested investor who could solve KAABOO's financial woes. The 2018 KAABOO Del Mar festival failed to generate sufficient cash to finance the 2019 festival. Vendors from the 2018 festival were demanding payment, and other cash deadlines for the 2019 festival were fast approaching.[223] KAABOO had dried up all other possible sources: no financing was coming through from the series financing rounds;[224] Mr. Gordon had warned Mr. Walker and Mr. Wolkov that he wouldn't "come to the rescue;"[225] any hope for cash in-flows from KAABOO Cayman were

---

[220] *Maverick*, 2020 WL 1655948, at *29.

[221] *NetApp, Inc.*, 2023 WL 4925910, at *13.

[222] *Id.*

[223] JX267.

[224] JX474 at 3902; JX145; Walker Tr. at 148; JX474 at 3024-25.

[225] JX61 at 6687; Walker Tr. at 155-56; Wolkov Tr. at 410-12; Gordon Tr. at 1308.

dashed when KAABOO Cayman's joint partner backed out of producing future Cayman festivals; and, KAABOO Dallas had suffered considerable losses.[226]

KAABOO also had an opportunity to sell KAABOO to Virgin Fest. Virgin Fest had a genuine interest in acquiring KAABOO Del Mar. Mr. Hagle had positive experiences attending the events.[227] He didn't see the festival as competitive with Virgin Fest and believed both sides *could* extract value from a long-term partnership.[228]

Virgin Fest has proved that KAABOO management made knowingly false representations in the July 4th Financials with the intent to induce Virgin Fest to acquire KAABOO Del Mar.

### d. *But Virgin Fest didn't prove justifiable reliance on the July 4th Financials.*

To carry its burden on its fraud claims, Virgin Fest must prove that it justifiably relied upon the July 4th Financials. The recipient of a false representation "must in fact have acted or not acted in justifiable reliance upon it."[229] Whether reliance is determined by employing an objective standard.[230] A finding of justifiable

---

[226] JX478 at 3027.

[227] Hagle Tr. at 969, 972.

[228] *Id.* at 993.

[229] *Universal Enter. Grp., L.P. v. Duncan Petroleum Corp.*, 2013 WL 3353743, at \*14 (Del. Ch. July 1, 2013) (quoting *NACCO Industries, Inc. v. Applica Inc.*, 997 A.2d 1, 29 (Del. Ch. 2009)).

[230] *Great Hill Equity Partners IV, LP,* 2018 WL 6311829, at \*33.

reliance isn't possible if the recipient was aware of a representation's falsity.[231]

Mr. Hagle says that he justifiably relied on the July 4th Financials, namely that the 2019 KAABOO Del Mar festival would be profitable. Mr. Hagle testified at trial that Mr. Walker and Mr. Gordon represented to him that the corporate overhead costs were already incorporated in the other expense categories, and that the positive EBITDA number for 2019 was therefore accurate.[232]

There is no dispute that Mr. Hagle closely scrutinized the July 4th Financials. His initial impression was that—at least as to the projections beyond 2019—they were numbers he could not rely on and were "fantasy land."[233] As to the 2019 numbers, however, he testified that Mr. Wolkov and Mr. Gordon convinced him that the numbers were accurate. According to Mr. Hagle, he believed those 2019 numbers to be correct.[234]

Several considerations weigh against finding that Mr. Hagle justifiably relied

---

[231] *Maverick Therapeutics, Inc.*, 2020 WL 1655948, at *30 (citing *Universal Enter. Grp., L.P.*, 2013 WL 3353743, at *14; *T.P. Inc. v. J&D's Pets, Inc.*, 1999 WL 135243, at *4 (Del. Ch. Feb. 26, 1999) ("In this context, it is hornbook law that the plaintiff must rely upon the *truthfulness* of the representation at issue.") (quoting 37 *Am. Jur.* 2d § 226 (1968) ("It follows that in any fraud case, in order to secure relief, the complaining party must honestly confide in the representations or, as has been said, must reasonably believe them to be true. The law will not permit one to predicate damage upon statements which he does not believe to be true, for if he knows that they are false, it cannot truthfully be said that he is deceived by them")); *see also* 37 *Am. Jur.* 2d § 236 ("Representations made to a plaintiff that the plaintiff actively disbelieves cannot serve as a basis for claiming fraud.")

[232] Hagle Tr. at 999-1000.

[233] Hagle Dep. Tr. at 94.

[234] Hagle Tr. at 1169-1170.

on the July 4th Financials. First, Mr. Hagle knew, or at least should have known, that the ticket revenue numbers were inflated. Mr. Hagle had access to current pass sales during the seven-day due diligence period.[235] Too, Mr. Felts, as a board member of KAABOO, and an attendee of the August and September board meetings, had access to this information.[236] Mr. Felts was already providing self-dubbed "Confidential" "Intel" to Mr. Hagle during the negotiation of the LOI.[237] It is reasonable to expect that he continued to do that throughout the negotiations and up to the execution of the other agreements.

Second, the Court's harmonization of the credible evidence reveals that Mr. Hagle maintained true (and justified) doubt about Messrs. Wolkov and Gordon's explanation that the corporate overhead was already incorporated in the other costs. At his deposition, Mr. Hagle introduced for the first time his handwritten notes of the July 4th Financials.[238] Those notes and Mr. Hagle's deposition testimony demonstrate that Mr. Hagle didn't justifiably rely on the July 4th Financials. Mr. Hagle's later reparative recollection was simply less convincing.[239]

In Mr. Hagle's handwritten version of the July 4th Financials, he wrote the

---

[235] JX296; JX660.

[236] *See, e.g.,* JX367.

[237] JX241.

[238] *See* Hagle Dep. Tr. at 82-84, 141-43.

[239] *Cf.* Hagle Tr. at 999-1000.

words "Add back opex and management fee at 2 percent."[240]   When asked at his deposition what he meant by that, Mr. Hagle recounted:

> Yeah. That's after my discussions with [Mr. Wolkov] when I pointed out that it did not have that.  And we, in the room, did a very quick calculation on what that might be.  And if we add back in the overhead expense to Eventpro for managing and operating these festivals, it would adjust the EBITDA so that – downward by about a million five-seventy-five.[241]

And when then asked why he circled the phrase "direct hard cost inc[luding] corp admin." in the left-hand margin, he explained,

> Well, because I don't see anything. We're looking at KAABOO opex reimbursement and event management fees and incentive management fees.  And if you look at 2018, it's not applicable. If you look at 2019, it's not applicable. And then all of a sudden jumps in 2020.
>
> So what it seemed to me is, the KAABOO festivals that were being put on in 2018 and '19, there had to be a fee structure to management.  Management doesn't do this for nothing.  Bryan Gordon is not a guy that does anything for anybody without being paid for it, and all those numbers are missing.[242]

At trial, however, Mr. Hagle added that Mr. Wolkov and Mr. Gordon had convinced him that:

> all of the KAABOO overhead, all the expenses, everything that it took to put on this festival is incorporated into the other numbers . . . [so] that when you look at the EBITDA at the end, the EBITDA is truly representative of the total cash surplus or deficit that it took to run the

---

[240]  JX598.

[241]  Hagle Dep. Tr. at 144-45.

[242]  *Id.*

festival during this period of time.[243]

When asked at trial about the note to "Add back opex and management fee at 2 percent," Mr. Hagle said that he did that "as an internal analysis to me just to see if I had hired a management fee in 2019 it would have been to that number.  It has nothing to do with the profitability that was projected in 2019."[244]

Putting aside that Mr. Hagle appears to have failed to raise these details in his deposition testimony, Mr. Hagle's suggestion that the "add back opex and management fee at 2 percent" was an "internal analysis" makes far less sense.

If Mr. Wolkov truly represented to Mr. Hagle that the corporate overhead numbers were already baked in the other direct costs, one wouldn't then add back the corporate overhead fee as an "internal analysis."  This exercise would be duplicative and would seemingly overestimate EBITDA.  In addition, if the numbers were already baked into the other costs, one would expect the operating expenses in those rows for 2020 to decrease, because those expenses would be pulled out and reflected in the opex reimbursement fee.  Instead, the non-corporate overhead expenses from 2019 to 2020 increase.[245]

Third, Mr. Hagle is a sophisticated businessman whose subsequent conduct

---

[243]  Hagle Tr. at 999-1000.

[244]  *Id.* at 1142.

[245]  *See* JX197.

showed a lack of reliance. He scrutinized the numbers, and he identified the discrepancies in the July 4th Financials. Indeed, other interested parties identified the same discrepancy.[246] In addition, after the September 6 KAABOO Board meeting, in which updated forecasts were provided to Board members, including Mr. Felts, Mr. Hagle sent a letter to KAABOO stating that Virgin Fest instructed their attorneys to stand down on the matter.[247] Only after Mr. Hagle was able to obtain further concessions, including the removal of Mr. Gordon at Virgin Fest and the acquisition of KAABOO's intellectual property, did he come back to the table.

Mr. Hagle saw the warning signs, but nonetheless proceeded to go through with the transaction.

For these reasons, Virgin Fest did not justifiably rely on the July 4th Financials. Thus, Virgin Fest has failed to prove its claims for fraud as to them.[248]

### 2. Virgin Fest's Remaining Fraud Claims

Virgin Fest alleges additional fraudulent acts, but its attendant counterclaims fail for similar reasons.

Virgin Fest alleges that KAABOO failed to disclose subsequent ticketing

---

[246] *See* JX300; JX301.

[247] JX369.

[248] This finding should not be misunderstood as in any way condoning KAABOO's chicanery that underpins this fraud claim. It is merely a recognition that the Court must find that one claiming fraud *justifiably* relied on the deceit alleged. Here, Virgin Fest at the very least intuited the dubiety of the numbers presented and instability of the presenting entity, engaged its own risk-reward analysis, extracted what further it could, and moved forward with the deal.

forecasts. But as explained above, Virgin Fest could not justifiably rely on information, or the concealment thereof, that it knew to be fraudulent or that would uncover fraud it was already aware of. Mr. Hagle was receiving insider information from Mr. Felts throughout the negotiation process. He also had direct access to information that would have shown current pass sales through the due diligence process. For these reasons, Virgin Fest has failed to prove fraud as to the non-disclosure of subsequent ticketing forecasts.

Virgin Fest says that KAABOO lied in the LOI. KAABOO represented in the LOI that Virgin's $2 million loan "shall be in the senior most position" and paid with KAABOO Del Mar income prior to the payment of any other losses, fees."[249] The parties entered into the LOI on August 13th. Just one day before, Gemini agreed to subordinate its loan to Virgin Fest's in exchange for added consideration.[250] Virgin Fest argues that failure to disclose this deal induced it into loaning KAABOO $2 million.

Yet, even if true, Virgin Fest fails to prove any damages distinct from what it would have recovered under the APA. The LOI was a non-binding agreement. It stated that, upon completion of a sale and pursuant to the Loan Agreement and APA, the loan would convert into a down payment on the $10 million purchase price of

[249] JX275 § 2(a)(i).

[250] *Id.*; JX277; JX289.

KAABOO Del Mar.[251]  Resultingly, the loan, by September 12th, became forgiven and was "deemed paid in full."[252]  And Virgin Fest, therefore, suffered no discernable injury from the non-disclosure of the payment to Gemini.[253]

Virgin Fest complains that Messrs. Gordon and Walker committed fraud by misusing their roles as dual fiduciaries of both Virgin Fest and KAABOO.  But these are breach of fiduciary duty claims costumed as fraud claims.  Virgin Fest can obtain no relief for such fiduciary-duty claims here.  These claims fail.

Finally, Virgin Fest contends that KAABOO management committed contractual fraud by making knowingly false representations in the APA.  As discussed above, the contractual fraud claims premised on the July 4th Financials fail because Virgin Fest didn't prove justifiable reliance.  Now, as discussed below, the other contractual fraud claims fail for want of showing falsity.[254]

---

[251]  JX275 § 2(a)(i), 12; JX277 § 2.5; APA 1.08(d).

[252]  JX277 § 2.5.

[253]  Virgin Fest also claims that KAABOO committed fraud by failing to disclose the debts from KAABOO Cayman and KAABOO Dallas pursuant to the terms of the LOI.  This claim also fails for failure to show damages.

Lastly, for similar reasons, Virgin Fest fails to prove its Fifteenth counterclaim regarding breach of the LOI and Loan Agreement. The LOI was a non-binding agreement, and the APA terminated the Loan Agreement upon closing. APA § 1.08(d). Too, for the Loan Agreement, Virgin Fest fails to show any damages because the loan converted into the purchase price upon execution of the APA, and if there were any damages, Virgin Fest has failed to show that they would be distinct from any damages retrievable under the APA.

[254]  The civil conspiracy claims fail because they are predicated on the unproven fraud claims.

### 3. Breach of Contract under the APA

A breach of contract requires (1) a contractual obligation, (2) a breach of that obligation, and (3) resulting damages.[255] The Court will read a contract as a whole and will give each provision and term effect, so as not to render any part of the contract surplusage.[256] The Court will give effect to the plain meaning of the clear and unambiguous terms and provisions of a contract.[257] If the contractual language is clear, the Court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[258] "[A] contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[259] If there is ambiguity, then the Court "may consider extrinsic evidence to resolve the ambiguity."[260]

One championing a breach-of-contract claim must establish each of its elements by a preponderance of the evidence.[261]

---

[255] *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 548 (Del. Super. Ct. 2005), *aff'd*, 886 A.2d 1278 (Del. 2005).

[256] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (citations omitted).

[257] *Id.*

[258] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016).

[259] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

[260] *Salamone v. Gorman*, 106 A.3d 354, 374 (Del. 2014).

[261] *See Facchina Constr. Litigs.*, 2020 WL 6363678, at *14 (defining burden of proof in trial of such claims and counterclaims) (citing *Reynolds v. Reynolds*, 237 A.2d 708, 711 (Del. 1967) (defining preponderance of the evidence); *Oberly v. Howard Hughes Med. Inst.*, 472 A.2d 366,

## a. *KAABOO breached the APA.*

KAABOO breached the APA by representing that the July 4th Financials were accurate and failing to disclose to Virgin Fest its existing debt to Mr. Gordon. That said, Virgin Fest fails on its other contractual claims under the APA.[262]

Virgin Fest says that KAABOO breached the APA by affirming that all prior disclosures were true and that KAABOO had not omitted material facts. Virgin Fest prevails on this with respect to the July 4th Financials under the APA. The APA contained the following representation:

> [t]o Sellers' Knowledge, no representations or warranties by Sellers in this Agreement, nor any other Transaction Document or other document, exhibit, statement certificate or schedule or other information (financial or otherwise) furnished to Buyer in connection with the transactions contemplated hereby contains any untrue

390 (Del. Ch. 1984)); *Dieckman v. Regency GP LP*, 2021 WL 537325, at *18 (Del. Ch. Feb. 15, 2021).

[262] Counterclaims Eight and Thirteen are claims against Mr. Gordon arising from Section 7.16 of the APA, *i.e.*, the Gordon Guarantee. Section 7.16 provides that Mr. Gordon "guarantees" payment when due of all 2019 Del Mar Festival Liabilities, as defined in Section 1.04(a). APA §§ 7.16, 1.01(a). Virgin Fest argues that KAABOO failed to use 2019 KAABOO Del Mar festival receipts to satisfy 2019 festival venders. JX500; VOB at 71. Virgin Fest asks the Court to enter a judgment against Mr. Gordon for certain amounts in each creditors' favor. In other words, Virgin Fest, through its prayers here, seeks judgment and relief on behalf of non-party creditors. By failing to demonstrate any injury or damages to itself in this regard, though, Virgin Fest fails on its breach-of-contract claims with respect to the Gordon Guarantee.

Counterclaim Fourteen seeks declaratory relief that KAABOO is required to defend, indemnify, and hold Virgin Fest and their affiliates harmless for excluded liabilities under the APA, and other lawsuits. Counterclaim Five also seeks indemnification under Section 6.02 of the APA for losses related to certain threatened lawsuits. But Virgin Fest's post-trial briefs didn't address these "other lawsuits" claims. They are, therefore, waived. *Oxbow Carbon & Mineral Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 502 n.77 (Del. 2019) ("[A]n issue not raised in post-trial briefing has been waived, even if it was properly raised pre-trial."). Virgin Fest also did not pursue Counterclaim Six, breach of the implied covenant of good faith and fair dealing, and thus is deemed waived.

statement of a material fact, or, to Sellers' Knowledge omits any material fact necessary to make the statements or facts contained therein not misleading.[263]

The July 4th Financials were a "document . . . furnished to Buyer in connection with the" acquisition of KAABOO Del Mar.[264]  KAABOO represented that such a document did not "contain[] any untrue statement of a material fact, or, to Sellers' Knowledge omit[] any material fact necessary to make the statements or facts contained therein not misleading."[265]  As already described, the July 4th Financials were, in the most forgiving light, purposely obfuscatory.  Virgin Fest, thus, prevails on its claim under the APA with regard to the July 4th Financials.

According to Virgin Fest, KAABOO also breached the APA because KAABOO did not disclose:  (1) 2018 debt to KAABOO Del Mar's vendors; (2) debts associated with KAABOO Cayman and KAABOO Dallas; and (3) debts Mr. Gordon placed on his personal American Express Card.  Section 3.05 provided, in relevant part, that "[n]o Seller has any Liabilities related to the Business that are of a nature required to be disclosed on a balance sheet prepared in accordance with generally accepted principles."[266]

---

[263]  APA § 3.10.

[264]  *Id.*

[265]  *Id.*

[266]  APA § 3.05.  The APA defines "Sellers" to include KAABOO LLC, KAABOO Management LLC, KB Eventpro, LLC, KAABOO-Del Mar LLC, KAABOOWorks Services, LLC, KAABOO Contract Services, LLC, and KAABOOWorks, LLC.  Annex I to APA.

Virgin Fest complains that KAABOO failed to disclose the debts associated with KAABOO Cayman and KAABOO Dallas. But Virgin Fest has failed to show that any of the Defendants owed a contractual obligation to disclose these debts under APA Section 3.05. "Sellers" are defined in Annex 1 of the APA.[267] Missing from that list are KAABOO Texas Investments, LLC and KAABOO Cayman Eventco, LLC—the KAABOO-affiliated joint venture entities of KAABOO Cayman and KAABOO Dallas.[268] As well, Virgin Fest has failed to show that these debts belonged to an entity other than KAABOO Texas Investments, LLC and KAABOO Cayman Eventco, LLC. So, Virgin Fest hasn't proven that a false statement was made with regard to the debts of KAABOO Cayman and KAABOO Dallas.

With respect to the 2018 debt to KAABOO Del Mar's vendors, APA Disclosure Schedule Section 3.05-Liabilities Disclosure included approximately $5.5 million of disclosed liabilities.[269] Virgin Fest presented no evidence that any of the 2018 debt to KAABOO Del Mar's vendors weren't included in those liabilities enumerated in Disclosure Schedule Section 3.05. So, this specific Virgin Fest claim fails.

---

[267] Annex I to APA.

[268] *See* JX76, JX110.

[269] JX602.

As to the payments made under Mr. Gordon's credit card, KAABOO paid at least $941,434 in September 2019 and $83,943 in October 2019.[270]  At trial, Mr. Gordon did not dispute that he paid $250,000 for a hotel deposit in August on an American Express credit card.[271]  Yet, again, Virgin Fest presented no evidence— or more than conclusory assertions—that that debt was not already disclosed on Disclosure Schedule Section 3.05.[272]  Virgin Fest therefore has not prevailed on its

---

[270]  JX657 at 13; Gordon Tr. at 1416; JX320.

[271]  Gordon Tr. at 1416.

[272]  *See* VOB at 32, 37.  To the extent Virgin Fest bases its contractual fraud claims on the non-disclosure of KAABOO's purported debts to Gordon, Virgin Fest failed to address how those allegations satisfy the elements of fraud.  Instead, in the argument section of its opening brief, Virgin Fest levels conclusory assertions that "Management lied in the APA" by "fail[ing] to disclose . . . the debts to Gordon placed on his personal American Express card."  VOB at 37.  It goes no further to show scienter, nor does it give any explanation for the damages it is owed for the purported non-disclosure of $250,000 that went towards hotel deposits.  Thereafter, in its answering brief, Virgin Fest doesn't raise these allegations under its fraud claims, but instead discusses them in relation to its breach of contract claims.  *See* Virgin's Post-Trial Answering Brief ("VAB") at Section III; *cf.* Section VI.  As a result, the contractual fraud claims flounder on that basis alone.  *Franklin Balance Sheet Inv. Fund v. Crowley*, 2006 WL 3095952, at *4 (Del. Ch. Oct. 19, 2006) ("Under the briefing rules, a party is obliged in its motion and opening brief to set forth all of the grounds, authorities and arguments supporting its motion."); *In re Asbestos Litig.*, 2007 WL 2410879, at *4 (Del. Super. Ct. Aug. 27, 2007) ("Moving parties must provide adequate factual and legal support for their positions in their moving papers in order to put the opposing parties and the court on notice of the issues to be decided.").  But even without that, Virgin Fest fails to specify how any alleged fraud based on this supposed failure to disclose debts to Gordon resulted in damages that are not already captured under the breaches of the APA that Virgin Fest has proven.  *See generally Norman v. Elkin*, 860 F.3d 111, 130 (3d Cir. 2017) ("Importantly, in cases involving both a breach of contract and an allegation of fraud, damages from the fraud must be pled 'separate and apart from . . . breach damages.'") (quoting *Cornell Glasgow, LLC v. La Grange Properties, LLC*, 2012 WL 2106945, at *9 (Del. Super. Ct. June 6, 2012); *EZLinks Golf, LLC v. PCMS Datafit, Inc.*, 2017 WL 1312209, at * 5-6 (Del. Super. Ct. Mar. 13, 2017) (holding that where plaintiff "failed to separate the damages incurred by any fraudulent conduct from those incurred by any breach of contract, the claim for the former should be dismissed") (cleaned up); *Cornell Glasgow,* 2012 WL 2106945, at *9 ("Delaware courts have consistently held that to successfully plead a fraud claim, the allegedly defrauded plaintiff must have sustained damages as a result of a

claim with regard to the nondisclosure of debts KAABOO owed to Mr. Gordon.[273]

### b. *Damages for KAABOO's Breaches of the APA*

Under Delaware law, the standard remedy for breach of contract "is based upon the reasonable expectations of the parties *ex ante*."[274] Such expectation—or benefit-of-the-bargain—damages are measured by the amount of money that would put the non-breaching party in the position it would have held if the breaching party's representations were true.[275] Benefit-of-the-bargain damages are equal to "the difference between the actual and the represented values of the object of the transaction."[276]

Virgin Fest purchased KAABOO Del Mar for $10 million. Using the *projections provided to Virgin Fest*, Virgin Fest's expert valued KAABOO Del Mar to be $10.06 million.[277] But using the *actual 2019 results* and applying the same growth projections KAABOO expected for 2020 and beyond, KAABOO's expert

---

defendant's actions. And the damages allegations may not simply 'rehash' the damages allegedly caused by the breach of contract.") (internal quotation marks omitted).

[273] Virgin Fest also argues that KAABOO violated APA Section 1.08(c) by not paying $2 million to Virgin Fest based on the cash received from the 2019 KAABOO Del Mar festival and by also improperly using 2019 receipts. *See* APA § 1.08(c). Regardless of Virgin Fest's potential success on these claims, any purported damages hereon would be duplicative and thus barred. *See* VOB at 68; APA § 6.02(b)(iii).

[274] *NetApp, Inc.*, 2023 WL 4925910, at *17; *Duncan v. Theratx, Inc.,* 775 A.2d 1019, 1022 (Del. 2001).

[275] *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1076 (Del. 1983).

[276] *Id.*

[277] JX574 at 3.

arrived at a valuation of less than $0.[278]

To arrive at this valuation, he used an income-based approach through a discounted cash flow analysis.[279] Virgin Fest's expert took the five-year projections provided to Virgin Fest, and applied a terminal value.[280] A 26.47% discount rate was used and traditional WACC.[281] Changing the 2019 starting point via the 2019 actual results, Virgin Fest's expert then used the same growth percentages or percent of revenue percentages that KAABOO management expected for each year going forward.[282] From this, Virgin Fest calculated a value of less than $0.[283]

KAABOO provided no competing valuation. KAABOO's expert didn't posit that the DCF method was incorrectly calculated, but instead opined that the acquisition didn't properly value KAABOO's other assets such as its intellectual property.[284] Without a competing valuation, KAABOO resorts to generalized statements that positive valuations may attach to companies that have never been

---

[278] *Id*.

[279] George Tr. at 1711.

[280] JX574 at 12.

[281] *Id*.

[282] *Id*.

[283] *Id.*

[284] JX581 at 3, 6-7. Though KAABOO's expert takes aim at the discount rate used in Virgin Fest's valuation, KAABOO nonetheless fails to proffer a competing valuation. *See* KOB at 82; George Tr. at 1740-41.

profitable—giving Tesla and Twitter as examples.[285]

At bottom, KAABOO didn't credibly rebut Virgin Fest's use of the DCF method. Nor has it proffered good reason to question Virgin Fest's analysis. Regardless of whether KAABOO was worth more than zero dollars, KAABOO has failed to provide any valuation of KAABOO Del Mar—besides the transaction price—that could warrant providing less than what the indemnification cap maximally allows. Virgin Fest seeks damages of $11.810 million—*i.e.*, the difference between KAABOO's purchase price and Virgin Fest's valuation expert's estimate. Damages arising under the APA, however, are capped at $2 million.[286] Thus, Virgin's damages are $2 million based on the breaches of the APA.[287]

---

[285] *See* KOB at 82.

[286] APA § 6.02(b)(i).

[287] Virgin Fest is not entitled to punitive damages. For one, Virgin Fest has failed to prove its fraud claims. It is therefore not entitled to punitive damages based on alleged fraudulent conduct. Two, Virgin Fest fails to satisfy the high standard required to obtain such an award based upon the contractual breaches found.

A party's conduct must "exhibit[] a wanton or willful disregard for the rights" of the other. *Ripsom v. Beaver Blacktop, Inc.*, 1988 WL 32071, at *16 (Del. Super. Ct. Apr. 6, 1988) (citing *Cloroben Chem. Corp v. Comegys*, 464 A.2d 887 (Del. Super. Ct. 1983)). Punitive damages may be appropriate for "egregious cases of willful and malicious breach of contract." *Cassan v. Nationwide Insurance Co.*, 455 A.2d 361 (Del. Super. Ct. 1982). "[T]his Court has phrased the test for punitive damages in breach of contract cases in various ways . . . [t]he import of these cases suggests that punitive damages may not be awarded for breach of contract unless the intentional breach is similar in character to an intentional tort." *Ripsom*, 1988 WL 32071, at *16.

KAABOO's contractual breaches of the APA and Management Contracts, which will be described in more detail below, fall short of the standard of "egregious[ness]" or "willful and malicious" conduct. KAABOO made false representations, but Virgin Fest was aware of KAABOO's lack of profitability. And though KAABOO breached the Management Agreements, KAABOO's actions weren't aimed at injuring Virgin Fest, but cutting expenses for its economic

- 60 -

### 4. Breach of the Management Contracts

Virgin Fest does not seek regular damages for its breach-of-contract claims against KAABOO under the Management Contracts.[288] Instead, Virgin Fest argues that KAABOO's breaches of the Management Contracts gave Virgin Fest grounds to validly terminate those agreements.[289]

Virgin Fest has proven by a preponderance of the evidence that KAABOO was in default of the Management Contracts, thereby entitling Virgin Fest to terminate those contracts, absent any cure by KAABOO.

KAABOO breached the Management Contracts by terminating several key staff members. The PSA required KAABOO "to provide everyone and everything for the production of each Event . . . consistent with the first-class manner that [it has] previously produced those events."[290] The MSA required that "[a]ll services will be performed in a competent and professional manner, by qualified personnel and will conform to [Virgin Fest Los Angeles'] requirements hereunder."[291] Similarly, the Engagement Agreement required that KAABOO "has, and will continue to have, the assets, employees and other capabilities necessary to fully

---

survival. Virgin Fest has failed to prove malice or willfulness in those actions—or that such actions effectively equate to torts.

[288] VOB at 56.

[289] *Id*.

[290] PSA § 1(a).

[291] MSA § 6.3.

perform its services under the [MSA and PSA]."[292]

Following the 2019 KAABOO Del Mar festival, Virgin Fest feared that KAABOO intended to terminate several staff, thereby jeopardizing KAABOO's commitment to produce two upcoming festivals in the manner required under the Management Contracts. As feared, approximately a week after the festival and after Virgin Fest communicated its concerns of potential layoffs, KAABOO fired eighteen employees and terminated relationships with nine consultants.[293] Many of the terminations involved senior staff members, and among the consultants terminated, one included the lead person who organized KAABOO's iconic mural program.[294] KAABOO's staff went from approximately 50 employees to 35.[295] In comparison, after KAABOO Cayman and KAABOO Dallas, KAABOO fired only eight employees.[296]

Mr. Gordon's testimony at trial did not credibly explain the adequacy of KAABOO's new staffing levels. Mr. Gordon stated that KAABOO regularly reduced its staff after an event.[297] He also testified that Virgin Fest Los Angeles was

---

[292] Engagement Agreement § 4.

[293] JX538 at 54.

[294] *See id.*; Gordon Tr. at 12.

[295] Compl. ¶ 74; JX538 at 12, 45.

[296] *See* JX178.

[297] Gordon Tr. at 1272.

"a less complicated festival than a KAABOO event," and so shrinking from owning and operating three KAABOO events to one KAABOO event and one Virgin Fest event required less manpower.[298]  Even still, KAABOO fired more than double the number of its staff after KAABOO Del Mar than those let go after KAABOO Cayman and KAABOO Dallas.[299]

The far more likely explanation was that KAABOO didn't have the funds to maintain pre-closing staffing levels.  As described above, KAABOO made a series of ad hoc changes to the July 4th Financials to support a picture of profitability. Neither Mr. Wolkov nor Mr. Gordon identified any corresponding cost-saving measures to justify those cuts.  Having failed to identify cost-saving measures then,

---

[298]  *Id.* at 1271-72.

[299]  KAABOO heavily relies on Mr. Gordon's testimony that the post-KAABOO Del Mar staffing levels were adequate.  *Id*. at 1281-1289.  Yet KAABOO justified several staffing cuts on the erroneous belief that the PSA didn't require KAABOO to provide ticketing and VIP services. Section 1(a)(i) of the PSA requires that KAABOO provide "VIP Hospitality and operations."  PSA § 1(a)(i).  It also required that KAABOO provide everything "reasonably necessary for the production and presentation of each Event."  *Id.* § 1(a).  Virgin Fest also had final approval rights over ticketing, raising the logical inference that KAABOO had default responsibility for ticketing as part of the production and operations of the festivals.  *Id*.  KAABOO's failure to provide these services, therefore, was a breach of the PSA.

KAABOO's arguments to the contrary are without merit.  It cites to a proposed amendment to the PSA that would shift the responsibility for ticketing services to KAABOO, but offers no evidence that the parties agreed to the draft.  Plaintiffs' and Counterclaim Defendants' Answering Brief ("KAB") at 46 (D.I. 438); JX423.  It also creates artificial terminology not present in the PSA.  KAABOO argues that ticketing only constitutes "revenue" generating activities, not "production."  KAB at 47.  Or, that KAABOO was responsible for "onsite ticketing" services, but not "year round" ticketing services.  *Id.*  at 47. The PSA doesn't make these contrived distinctions. The PSA does not define and rather leaves uncapitalized "Production" and "Revenue."  The PSA also makes no distinction between "onsite" and "year-long" ticketing services.  KAABOO's arguments fail, because its contractual interpretations do not give plain effect to the PSA's clear and unambiguous language.

- 63 -

KAABOO tried to find them later—by terminating several members of its staff.

In addition, there's no evidence that the 2019 KAABOO Del Mar festival turned any profit at all. Though KAABOO entered into long-term management contracts with Virgin Fest, Virgin Fest was its only client. Its viability depended on the continued business of Virgin Fest. And with Virgin Fest's failure to pay the first month's invoices under the PSA and MSA, KAABOO was forced to shutter its doors and close down business.[300] Virgin Fest has proven by a preponderance of the evidence that KAABOO breached the Management Contracts by failing to maintain adequate staffing levels.[301]

---

[300] Walker Tr. at 99; Wolkov Tr. at 384.

[301] Virgin Fest argues for additional breaches of the PSA and MSA. Because Virgin Fest has proven that KAABOO breached the PSA and MSA by terminating its staff, the Court briefly addresses the other claims. Virgin Fest contends that KAABOO breached the PSA by refusing to replace Mr. Gordon's daughter. The PSA provides that KAABOO is to have "sole responsibility" for its employees, but if any employee "who is performing services is found to be unacceptable to [Virgin Fest], in [Virgin Fest]'s reasonable judgment, [Virgin Fest] will notify [KAABOO] and [KAABOO] will immediately take appropriate corrective action." PSA § 1(d).

Virgin Fest notified KAABOO of its concern that Mr. Gordon's daughter would serve as "Co Manager" of KAABOO, the senior-most role at KAABOO. Felts Tr. at 755-6; JX453; JX462. Virgin Fest's concern was reasonable. Ms. Gordon was new to the position, and had limited managerial experience. Prenger Dep. Tr. at 172. Mr. Prenger at Virgin Fest alternatively proposed serving on a three-member team with Ms. Gordon and assume overall responsibilities as General Manager. JX462. Due to his increased managerial responsibilities, he proposed a $145,000 fee reduction for KAABOO. *Id*. KAABOO refused to accept a fee reduction because, in its view, Mr. Prenger's proposal to serve as overall General Manager was a "reduc[tion to] [KAABOO]'s Scope of Engagement." *Id*. Under Section 1(a)(viii) of the PSA, if there was a reduction in KAABOO's "Scope of Engagement," the PSA provided that "[KAABOO]'s Fees and Reimbursements set forth in Section 2 shall not be reduced." PSA § 1(a)(viii). Virgin Fest, however, maintained its request for a fee reduction because "the General Management Team lacks both the local knowledge and the experience necessary to produce the event." JX496. Regardless of whether Virgin Fest's alternative proposal to install Mr. Prenger as the overall General Manager constituted a reduction in KAABOO's scope of engagement or a remedial response to KAABOO's

- 64 -

KAABOO's financial woes and manipulation of its numbers finally caught up to it.[302]

### 5. Claims for Declaratory Relief: the October 18 Letter

Virgin Fest seeks a declaration that KAABOO's defaults under the Management Contracts, and KAABOO's failure to timely cure these defaults constituted material breaches of those agreements and therefore are grounds for termination.[303] KAABOO's breaches of the Management Contracts provided Virgin Fest with grounds to validly terminate those agreements.

The Engagement Agreement provided that the Management Contracts may be terminated by:

> *Cause* – by either party, in whole or in part, upon providing written notice to the other party thereto, if the other party thereto breaches any of the terms and conditions of this Agreement or the [PSA and MSA] in any material respect, and the breaching party has not cured such

management deficiencies, KAABOO had an obligation to take "appropriate corrective action." PSA § 1(d). KAABOO failed to do so by maintaining the status quo.

In addition, the MSA delineated the scope of services KAABOO agreed to provide in Attachment A to Exhibit A to the MSA. MSA § 1. Attachment A set the number of members required on each servicing team. *See* Attachment A to MSA. KAABOO was deficient in several areas. For example, the MSA required a six-member accounting team, but KAABOO only had three accounting employees in October. JX480 at 5472. The MSA required three "Site Operations" employees, but KAABOO had two. *Id.* KAABOO responds—without citing to any language in the MSA—that it wasn't required to use full staffing for those operations on a year-round basis. KAB at 56-57. In sum, Virgin Fest has prevailed on its claims that KAABOO failed to provide adequate staffing under the Management Contracts.

[302] Virgin Fest also argues that KAABOO breached Section 3(a) of the Engagement Agreement by failing to deliver "monthly reconciliation reports." VOB at 71; Engagement Agreement § 3(a). But Virgin Fest has failed to show it suffered any damages as a result of any alleged failure to deliver such reports. So, this claim fails.

[303] SACC ¶¶ 211-12.

breach within thirty (30) business days following written notice thereof by the non-breaching party.[304]

Without doubt, KAABOO was in material breach of the Management Contracts. Because KAABOO was in material breach of the Management Contracts, Virgin Fest was excused from paying KAABOO's invoices. KAABOO's breaches of the Management Contracts provided Virgin Fest with grounds to validly terminate those agreements. And, on October 18, Virgin Fest provided notice of the defaults under the Management Contracts.

KAABOO insists that the October 18 Letter terminated the Management Contracts. Not so. On October 18, Virgin Fest sent a letter to KAABOO identifying defaults under the relevant agreements and proposing that the parties "mutually and amicably terminate" those agreements.[305] The letter concluded stating, that "for the avoidance of doubt, this letter shall constitute notice of default."[306]

The language of the letter is clear and unambiguous, and though the letter itself is not a contract, it is notice of a party's exercise of its rights under a contract —here, the Management Contracts. And, because the operative termination provisions thereof required written notice, that contract language controls.

Accordingly, the letter constitutes "a notice of default," and pursuant to

---

[304] Engagement Agreement § 5(b)(i).

[305] JX501.

[306] *Id.*

Section 5(b)(i) of the Engagement Agreement, the Management Contracts were terminable for cause if KAABOO failed to cure the breach within thirty business days following written notice thereof.

## B. KAABOO'S AND MR. GORDON'S CLAIMS

KAABOO pursued claims for breach of contract and the implied covenant of good faith and fair dealing at trial. Both are largely predicated on the question of whether Virgin Fest had grounds to terminate the Management Contracts. KAABOO argues that Virgin Fest wrongfully terminated the Management Contracts, failed to pay its invoices pursuant to the Management Contracts, and failed to transfer shares of Virgin Fest Investco stock.[307] Mr. Gordon also seeks payments under the Gordon Side Agreement.[308]

The Court can make short work of these claims. Virgin Fest did not wrongfully terminate the Management Contracts. As already explained, KAABOO was in material breach of the Management Contracts; the October 18 Letter provided KAABOO with the notice of default thereof. KAABOO's subsequent failure to cure the noticed defaults provided valid grounds for termination. In addition, the antecedent material breaches by KAABOO under the Management Contracts excused Virgin Fest's obligations to pay the monthly invoices.

---

[307] Compl. §§ 85-88; KAB at 82.

[308] D.I. 7; KOB at 51-52.

KAABOO also failed to prove its claim under APA Section 1.05(b) for the transfer of shares of Virgin Fest Investco stock. Section 1.05(b) of the APA provides that Virgin Fest deliver "an aggregate of 25 restricted Class B Common Units" of Virgin Fest Investco to KAABOO.[309] Virgin Fest doesn't dispute its failure to deliver the shares.[310] Nonetheless, KAABOO failed to provide any evidence of the stock's value at trial, and doesn't now seek money damages. Thus, KAABOO's claim for relief under Section 1.05(b) fails here.

The "Gordon Side Agreement," or more aptly, Mr. Gordon's resignation letter, was the product of Virgin Fest's proposed conditions to a revived deal in acquiring KAABOO Del Mar.[311] Pursuant to the Gordon Side Agreement, Mr. Gordon agreed to resign from Virgin Fest's board in exchange for a one-time severance payment of $250,000 and consulting fee of $360,000.[312] The severance payment was conditioned on Virgin Fest Investco, LLC receiving $20 million in one or more transactions or closings.[313] On December 9, 2020, the Court dismissed Mr. Gordon's severance payment claim on the basis that the claim was not ripe because the

---

[309] APA § 1.05(b).

[310] VOB at 91.

[311] JX615; *see* Ex. H to the APA ("Gordon Side Agreement").

[312] Gordon Side Agreement at 1.

[313] *Id.*

condition precedent to that payment had not occurred.[314]

KAABOO still has failed to prove that Virgin Fest Investco ever received $20 million in funding. KAABOO's sole support for its contention is the conclusory statement that "[Mr.] Hagle admitted that a secured loan of $23 million was made to Investco," and cites to three pages of his deposition testimony.[315] There is nothing in that deposition testimony that establishes that Virgin Fest Investco received a secured loan. Mr. Gordon is not entitled to his claimed severance payment under the Gordon Side Agreement.

Nonetheless, Mr. Gordon does prevail on his claim for the consulting fee. Virgin Fest's only defense to the consulting fee is that KAABOO's fraud releases Virgin Fest's obligation to pay the consulting fees. But, again, Virgin Fest failed to prove its fraud claims. Thus, Mr. Gordon is entitled to the consulting fee of $360,000 plus interest.

KAABOO's second count alleges a breach of the implied covenant by Virgin Fest's based, again, on the purported wrongful termination of the Management Contracts. Again, Virgin Fest had ample valid grounds to terminate those agreements. KAABOO's implied covenant claim fails.

---

[314] December 9, 2020 Tr. Ruling at 56-63 (D.I. 124).

[315] Hagle Dep. Tr. at 13-14.

- 69 -

## C. ATTORNEY'S FEES

Virgin Fest seeks an award of attorney's fees and costs for claims under the PSA, MSA and APA. The PSA and MSA contain mirror-image fee-shifting provisions the applicability of which are undisputed.[316] Virgin Fest is entitled to its reasonable fees on the claims it has prevailed upon under the PSA and MSA.

For its request for attorney's fees under the APA, Virgin Fest points to Section 6.02. Unlike the fee-shifting provisions in the MSA and PSA, Virgin Fest seeks its reasonable attorney's fees through the indemnification provisions of the APA. Section 6.02 requires that KAABOO indemnify Virgin Fest for "any Loss" suffered as a result of any "breach or inaccuracy of any representation or warranty" or any "breach, non-compliance or non-performance of any covenant, agreement or obligation" in the APA.[317] "Loss" includes "reasonable attorneys'" fees and expenses.[318] Setting aside the question of whether the provision constitutes a first-party indemnification provision entitling Virgin Fest to fees, Virgin Fest's damages

---

[316] PSA § 5(d) (Section 5(d) of the PSA states that: "in the event of any action or litigation between any of the Parties to enforce any provision of this Agreement, the prevailing party shall be entitled to recover from the losing party, in addition to any other recovery, all costs and expenses, including reasonable attorneys' fees.")); MSA § 15 ("In the event of any action or litigation between any of the parties to enforce any provision of this Agreement, the prevailing party shall be entitled to recover from the losing party, in addition to any other recovery, all costs and expenses, including reasonable attorneys' fees.").

[317] APA § 6.02.

[318] Annex II to APA.

have already hit the $2 million indemnity cap.[319]

Given this, Virgin Fest is entitled to an award of costs and expenses (including reasonable attorney's fees) under Section 5(d) of the PSA and Section 15 of the MSA.

## VII.  CONCLUSION AND VERDICT

Consistent with the above, judgment is entered in favor of Virgin Fest under the APA and Management Contracts.  It is entitled to an award of damages totaling $2 million for its APA claims.  It is also entitled to an award of its reasonable attorney's fees and expenses for those claims on which it has prevailed under the MSA and PSA.

Mr. Gordon is entitled to $360,000 in consulting fees plus interest.

The parties are instructed to prepare a form of final order of judgment consistent with this decision.

**IT IS SO ORDERED.**

/s/ *Paul R. Wallace*

Paul R. Wallace, Judge

Original to Prothonotary
cc:  All counsel via File & Serve

---

[319]  APA § 6.02(b)(i).